938 A.2d 839

**R & D 2001, LLC, et al.**

v.

**Douglas S. RICE, et al.**

**No. 33, Sept. Term, 2007.**

Court of Appeals of Maryland.

Jan. 4, 2008.

Jeffrey W. Harab (Law Offices of Jeffrey W. Harab, P.C., Chevy Chase; Richard A. Finci of Houlon, Berman, Bergman,

Finci & Levinstein, LLC, Greenbelt), all on brief, for petitioners.

Dale A. Cooter (James E. Tompert of Cooter, Mangold, Tompert & Karas, LLP, Washington, DC), on brief, for respondents.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER (Retired, Specially Assigned), and DALE R. CATHELL (Retired, Specially Assigned), JJ.

WILNER, J.

This appeal has its roots in a $2.9 million money judgment entered against four joint tortfeasor defendants by the Circuit Court for Loudoun County, Virginia. There is no present contest as to the validity of that judgment. Three of the defendants entered into settlement agreements with the judgment creditor, appellant R & D 2001, LLC (R & D).

In an attempt to enforce the judgment against the only non-settling judgment debtor, appellee Douglas Rice, R & D filed proceedings in the Circuit Court for Howard County, Maryland, the Circuit Court for Montgomery County, Maryland, and the Circuit Court for Fairfax County, Virginia.[1] The case now resides simultaneously in this Court and the Supreme Court of Virginia. This appeal is from a summary judgment entered in one of the two actions filed in the Montgomery County court.[2]

Appellants importuned us to grant *certiorari* prior to proceedings in the Court of Special Appeals "for the sole purpose

---

1. At some point, R & D made a partial assignment of its judgment to the Nap Foundation, which is also an appellant. It does not appear that there is any divergence of interest between R & D and Nap, so, for convenience, we shall refer to them collectively as R & D.

2. It appears that several actions or proceedings were filed in both Howard and Montgomery County. First, appellants enrolled the Loudoun County judgment in the Circuit Court for Howard County. They then sought, in that court, a writ of garnishment, attachment of an

of facilitating the resolution of an appeal before the Supreme Court of Virginia" by certifying to that Court a question of Virginia law that was decided by the Circuit Court for Montgomery County. Indeed, accompanying their petition for *certiorari* was a motion to certify an attached question of Virginia law. In their brief, however, appellants have ignored that request for certification as though never made and instead insist that we decide ourselves not only the questions of Virginia law they previously wanted certified but issues of Maryland law as well. With some reluctance, we shall do so.

## BACKGROUND

This case concerns a group of men who, as active or passive investors in one or more limited liability companies, were in the business of developing golf courses in Virginia. Over a period of time commencing in July, 2002, R & D, a Virginia limited liability company supposedly controlled by David Gregory, invested $520,000 in another limited liability company, New Broad Run Golf LLC, which was intending to develop the Bear National Golf Course in Loudoun County, Virginia. The four principals in New Broad Run were Stanton Abrams, Timothy Kampa, Thomas Smyth, and Douglas Rice. Rice contends that Abrams and Kampa were the active participants in the project and that Smyth and Rice were merely passive investors. After learning that additional debt existed on the project of which it had been unaware, R & D demanded the return of its investment, and, when that demand was rejected, it filed suit against Abrams, Kampa, Smyth, and Rice in the Circuit Court for Loudoun County, alleging fraud, common law conspiracy, and statutory conspiracy under Virginia Code, §§ 18.2–499 and 18.2–500.

---

alleged interest that Rice had in a limited liability company, and sequestration of that interest. We are advised that, at some point, appellants filed a separate action in Howard County to annul a transfer of that interest by Rice to himself and his wife, as tenants by the entireties. A similar action was filed in the Circuit Court for Montgomery County—this case. Finally, a receivership action was brought by Rice in Montgomery County. The receivership action has no perceived bearing on what is now before us.

When the defendants failed to produce court-ordered discovery, the court entered a default judgment, as to liability only, against them. In January, 2004, a trial on damages was held before a jury, which, without distinguishing among the various counts, returned a general verdict in favor of R & D and against all four defendants for $988,000. Va.Code, § 18.2–499 permits a civil recovery when two or more persons combine or concert together for the purpose of wilfully and maliciously injuring another in his trade or business. That was the statutory conspiracy pled by R & D. Section 18.2–500 permits the court to treble damages awarded under § 18.2499, and that is what occurred. Following the jury verdict and the denial of appellees' motions for judgment N.O.V., the court trebled the damages awarded by the jury and entered judgment against all four defendants in the amount of $2,968,398. A "Final Order" entering that judgment was signed on February 20, 2004.

Rule 1.1 of the Virginia Supreme Court provides, in relevant part, that all final judgments shall remain under the control of the trial court, subject to modification, vacation, or suspension, for 21 days after the date of entry. On March 11, 2004—the twentieth day after entry of the final judgment—R & D entered into an "Accord and Satisfaction" agreement with Abrams and Kampa. The elements of that agreement, which we shall describe in further detail later, were (1) an assignment by Abrams and a Delaware limited liability company that he controlled of interests that they had in other limited liability companies to Kampa, (2) a mutual release of contract obligations by R & D and another Delaware limited liability company (Cottages at Beacon Hill, LLC) that arose from R & D's purchase of 10.6 acres of land adjoining the proposed golf course, (3) a joint and several promissory note by Abrams and Kampa in the amount of $175,000, payable to R & D, and (4) a Consent Order, agreed to by R & D, Abrams, and Kampa and signed by their respective counsel, that vacated the judgment entered against Abrams and Kampa and dismissed with prejudice the actions and claims against them.

The next day, March 12, the court signed an order suspending the judgment, apparently to allow the parties time to review the proposed Consent Order. On March 22, after a brief hearing, the court signed the Consent Order, which (1) noted that an accord and satisfaction had been reached between R & D, Abrams, and Kampa, (2) vacated the judgment against them, (3) dismissed the claims against them with prejudice, and (4) recited that the order would have no effect on either the claims or the judgment against Rice and Smyth. For whatever reason, additional suspension orders were entered on March 22 and March 29.[3] On April 12, 2004, upon expiration of the third suspension order, the judgment, as modified by the Consent Order, became final. Rice and Smyth filed an appeal to the Supreme Court of Virginia, complaining about the default judgment, certain jury instructions, and the trebling of the damages, but, in December, 2004, they dismissed their appeal. Just prior to the dismissal, Smyth entered a settlement agreement with R & D, under which he paid $1,000,000 in exchange for a release and a promise to vacate the judgment against him. That left Rice as the only defendant not having the benefit of an individual release or satisfaction. Appellants acknowledge that, in light of Smyth's payment, the amount of the judgment was reduced by that amount, to just under $2 million (plus accrued post-judgment interest).

In August, 2005, acting pursuant to Maryland Code, § 11–802 of the Cts. & Jud. Proc. Article, appellants filed the judgment against Rice in the Circuit Court for Howard Coun-

---

**3.** All three documents referred to in the Accord and Satisfaction appear to have been signed by the respective parties on March 11, 2004, contemporaneously with the Accord and Satisfaction. The Consent Order, having been reviewed by the parties, was entered by the court on March 22. Unless a further settlement with Rice or Smyth was contemplated, it is not entirely clear why the final judgment had to be suspended beyond March 22, although that is not an issue in this appeal. In the Montgomery County case, counsel for appellants asserted that the suspension was to allow Rice and Smyth, who had objected to the order, to perfect an appeal.

ty. Alleging that Rice, a resident of that county, owned a one-third membership interest in Mid–Atlantic Golf/Norbeck, LLC (Mid–Atlantic), a Maryland limited liability company, appellants had a writ of execution issued against that membership interest and filed a motion under Maryland Rule 2–648(a) to sequester it.[4] A month later, appellants filed the action now before us in the Circuit Court for Montgomery County, in which they complained that Rice had fraudulently conveyed his interest in Mid–Atlantic to his wife and sought to set aside that transfer.

The Howard County action was heard and decided first, in November, 2005. Through counsel, Rice made clear that he was not challenging the validity of the Virginia judgment, which he acknowledged had to be given full faith and credit. Rice's position was that (1) his interest in Mid–Atlantic had been conveyed to himself and his wife, Charlene, as tenants by the entireties, that Charlene was not a party to the Howard County case, and that the ability of the court to enter a sequestration order against either of them was questionable, (2) if appellants were contending that Rice had improperly conveyed his membership interest to his wife, that issue was fact-intensive, it could not be resolved without a trial, and it was currently pending in the Montgomery County case, (3) Mid–Atlantic was located in Montgomery County and had no

---

4. Although what occurred in Howard County is critical to one of the issues in this appeal, the evidence of that is not coherently presented. Some of the pleadings are in the record extract, others are in an appendix to appellants' reply brief. The transcript of the hearing was belatedly added by appellants. Some documents are not in the record extract or any appendix. It appears that appellants filed a number of pleadings, including a writ of execution, a request for a charging order that counsel later admitted was inappropriate because Mid–Atlantic Golf/Norbeck, LLC was not a partnership, a writ of garnishment which is not in an appendix or record extract, and a motion for sequestration pursuant to Rule 2–648(a), which, as we shall later discuss, applies only to a judgment "prohibiting or mandating action," and not an ordinary money judgment. The writ of execution and writ of garnishment had not been served on Rice prior to the hearing. At the hearing, counsel indicated that the purpose of the sequestration request was to seize the membership interest itself; the garnishment was to seize any money Mid–Atlantic owed to Rice.

presence in Howard County, and (4) the Accord and Satisfaction given by petitioner in Virginia served to discharge the judgment against all defendants, including Rice, so, although the judgment was valid, nothing was owed on it. If nothing was owed, there was nothing to enforce.

At the conclusion of the hearing, the court dictated an order from the bench, which was later confirmed by a written Confirmatory Order for Injunction, Sequestration, Ancillary Relief, and Order for Appointment of a Trustee. That order, entered November 30, 2005, reflected a concern expressed by the court during the hearing over the nature of the membership interest—what it encompassed. The court understood that the real value of the membership interest lay in the property owned by Mid–Atlantic, but there was no evidence of either the identity or the value of that property. It was not clear to the court, therefore, what effect a sequestration of the membership interest would have on the property underlying it.

In an attempt to enforce the judgment, to which the court was undisputedly required to give full faith and credit, and yet deal with those issues, the order had four principal provisions. First, it appointed a trustee to receive and hold in trust for appellants Rice's one-third membership interest in Mid–Atlantic. The trustee was to investigate and identify all property interests encompassing that membership interest and, to that end, was authorized to apply for further relief, including discovery, valuation, attachment, and garnishment.

Second, the order both enjoined and required certain conduct by Rice "or any person." Rice and the unnamed "any person[s]" were enjoined from assigning or disposing of the membership interest, and from negotiating, transferring, or disposing of any document representing or "settling out" the membership interest or property encompassing it, and they were affirmatively directed to disclose to the trustee the whereabouts of property encompassing the interest and to cooperate with the trustee in identifying such property.

Third, the order afforded appellants the right to pursue "appropriate action including valuation of said property" and

gave Rice the right to apply for a hearing "to present any defense as to why said property or specific items thereof should not be attached or subject to further jurisdiction or control of this Court." At any such hearing, the order continued, the court could "determine the most appropriate disposition of the said Membership Interest, if any, toward the Defendant's obligation to pay the Foreign Judgment...." Finally, the order directed the clerk to docket the order among the judgment records, the intent being that the order would constitute a lien on the membership interest, subject to further order of the court. It is not clear what more, if anything, has transpired in the Howard County case since that order was entered two years ago.[5]

In September, 2005, while the Howard County case was pending, appellants filed in the Circuit Court for Montgomery County the action that is now before us—a petition to set aside, as an alleged fraudulent conveyance, the transfer of Rice's one-third membership interest in Mid–Atlantic to himself and Charlene as tenants by the entireties. In contrast to the action in Howard County, they joined as defendants not only Rice, but also Charlene and Mid–Atlantic, appellees.

The petition contained four unnumbered counts. The first, apparently but tacitly invoking Maryland Code, § 15–204 of the Commercial Law Article (CL), alleged that Rice conveyed his interest in Mid–Atlantic to Charlene on or prior to January 21, 2005, without fair consideration, and that the transfer left Rice insolvent and unable to satisfy the judgment against him.[6] The second, based on CL § 15–205, alleged that Rice

---

**5.** In support of a motion to reconsider the grant of summary judgment in the Montgomery County action, counsel for appellants asserted that a second, fraudulent conveyance, action was brought in Howard County, similar to the one in Montgomery County, to annul the conveyance of Rice's membership interest to Charlene and himself. Neither the docket entries in the attachment, garnishment, sequestration case nor those in the second, fraudulent conveyance, case are in the record extract or any appendix to the parties' briefs.

**6.** CL § 15–204 provides, in relevant part, that a conveyance by a person who is or will be rendered insolvent by it is fraudulent as to creditors

was engaged and would continue to engage in business transactions with regard to Mid–Atlantic and that the conveyance of his membership interest rendered the property remaining in his possession with regard to Mid–Atlantic insufficient as to the debt owed to appellants.[7] The third count, based on CL § 15–208(b)(2), charged that Charlene was not a member of Mid–Atlantic, that the conveyance occurred without the unanimous approval of the other members, that it was without fair consideration to Mid–Atlantic and payment of his debt to appellants, and that it rendered Rice insolvent as to appellants.[8] Finally, based on CL § 15–207, appellants charged that Rice and Charlene acted with the intent to hinder, delay, and defraud appellants as they attempted to collect the debt owed to them.[9] As relief, appellants asked that the conveyance be set aside and that the property conveyed be attached.

Although appellees raised a number of defenses in their answer, the only one pressed in an ensuing motion for partial summary judgment was accord and satisfaction. Their argument was that, by virtue of Virginia Code, § 8.01–443, the Accord and Satisfaction agreement between R & D, Abrams,

---

without regard to the transferor's actual intent, if the conveyance is made without fair consideration. The terms "insolvent" and "fair consideration" are defined in CL §§ 15–202 and 15–203, respectively. The first count seems to be based on § 15–204, although it does not mention that statute.

7. CL § 15–205 provides, in relevant part, that a conveyance made without fair consideration when the transferor is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital is fraudulent as to creditors and those who become creditors during the continuance of the business or transaction without regard to his actual intent.

8. CL § 15–208(b)(2) provides, in relevant part, that a conveyance of limited liability company property when the company is or will be rendered insolvent by it is fraudulent as to creditors of the company if the conveyance is made to a person not a member, without fair consideration to the company.

9. CL § 15–207 provides, in relevant part, that a conveyance made with actual intent to hinder, delay, or defraud present or future creditors is fraudulent as to both present and future creditors.

and Kampa served to satisfy the judgment, so that nothing more was owed on it. Appellants responded, in part, by claiming that appellees were barred by *res judicata* from raising that defense. The *res judicata* argument proceeded from the Consent Order entered by the Loudoun County court, which, as noted, specified that the order would have no effect on the claims or judgment against Rice. When Rice dismissed his appeal to the Virginia Supreme Court, appellants said, that order became final and settled the issue of whether the judgment was discharged as to him. That argument also served as the underpinning for a cross-motion for partial summary judgment that the Virginia judgment was valid and subsisting. Although there was some argument by appellants that Rice was collaterally estopped from raising the accord and satisfaction defense based on what occurred in Howard County, the argument was somewhat fleeting, and no claim was made that *res judicata* applied to the Howard County decision.

After hearing argument on the cross-motions, the court concluded, as a matter of law, that the accord and satisfaction entered into by R & D, Abrams, and Kampa served to satisfy in full the judgment against all four defendants and that, as a result, Rice's liability under that judgment had been discharged. Accordingly, it entered an order in July, 2006, granting appellees' motion for partial summary judgment and declaring that the outstanding amount of the Loudoun Count judgment had been fully satisfied. Although the motion was labeled as one for partial summary judgment, the effect of the court's ruling was to deny all relief to appellants, and the order entered judgment for appellees on all claims.

The court confirmed that ruling in September, 2006, when it denied appellants' motion to reconsider the ruling. In a memorandum opinion, the court held that the controlling Virginia law with respect to the effect of the accord and satisfaction was Virginia Code, § 8.01–443 and not § 8.01–35.1, as contended by appellants. Section 8.01–35.1, the court held, applied only to pre-judgment settlements. Although recognizing that the accord and satisfaction agreement did not "pur-

port to accept the settlement in 'full and final satisfaction' of the judgment" and was not intended to release Rice or Smyth, the court nonetheless held as a matter of law that it had that effect. The court also rejected appellants' argument that appellees were collaterally estopped from raising the accord and satisfaction defense because they had not raised it in connection with the enrollment of the Virginia judgment in Howard County.

As we indicated, appellants noted an appeal to the Court of Special Appeals and then asked, in a petition for *certiorari*, that we take the case in order to certify to the Virginia Supreme Court the question of which Virginia statute applied. Regrettably, in light of the fact that appellants have effectively withdrawn that request, we granted the petition.

## DISCUSSION

Appellants present two issues in their brief—whether the Montgomery County court erred (1) in applying § 8.01–443, rather than § 8.01–35.1, of the Virginia Code in concluding that the accord and satisfaction between R & D, Abrams, and Kampa served to satisfy in full the Loudoun County judgment, so as to preclude any enforcement action against Rice, and (2) in not giving preclusive effect under the doctrines of collateral estoppel, *res judicata*, and finality of judgment to the enrollment of the Loudoun County judgment in Howard County and the writ of execution and Confirmatory Order entered by that court. We shall deal with the second question first.

### Effect of Proceedings in Howard County

The proceedings in the Circuit Court for Howard County fall into two categories. First, acting pursuant to the Maryland Uniform Enforcement of Judgments Act, Maryland Code, §§ 11–801 through 11–807 of the Cts. & Jud. Proc. Article (CJP), appellants filed the judgment of the Circuit Court for Loudoun County with the Clerk of the Howard County Court, thereby giving it "the same effect and [ ] subject to the same procedures, defenses, and proceedings for reopening, vacating, staying, enforcing, or satisfying as a judgment of the court in

which it is filed." § 11–802(b). As we indicated in *Legum v. Brown*, 395 Md. 135, 142–43, 909 A.2d 672, 676–77 (2006), those statutes, along with a 1790 Federal statute, 28 U.S.C. § 1738, serve to implement the Constitutional requirement that each State give full faith and credit to the final judgments of its sister States. Having so filed the Virginia judgment, appellants then sought, by various methods, to enforce it—as noted, they filed a writ of garnishment and sought to attach and sequester Rice's interest in Mid–Atlantic.

Appellants claim that both the filing of the judgment with the clerk and the Confirmatory Order entered by the Howard County Court settled the question of the validity of the Virginia judgment and thereby barred appellants from contesting it by raising an accord and satisfaction defense in Montgomery County. Appellees disagree with that position on the merits and also contend that appellants are themselves barred from even raising that issue on appeal because they failed to raise it timely in the Circuit Court. Appellees note that, when they argued the effect of the accord and satisfaction below, appellants' only *res judicata*/collateral estoppel response was that appellees had failed to present that defense in the Loudoun County court when that court considered the Consent Order. Not until they filed a motion for reconsideration of the partial summary judgment did they argue the preclusive effect of the orders entered in Howard County. Appellees contend, in other words, that appellants are barred from complaining that appellees are barred.

The articulation of these defenses and responses is more complex than the answer to them. We start with the fact that the filing with the clerk of a final judgment entered by a court of record of a sister State pursuant to CJP § 11–802 is largely ministerial. A copy of the judgment is filed with the clerk, who thereafter must treat it "in the same manner" as a judgment of his or her own court. CJP § 11–802(a)(2). The filing simply enrolls or "domesticates" the foreign judgment in the Maryland county, and allows it, subject to such defenses as may properly be raised, to be enforced in the county. As appellees made clear throughout, they never contested the

*validity* of the Virginia judgment or asserted that Maryland should not give full faith and credit to it. Their argument, from the beginning, has been that, because of the accord and satisfaction, the valid judgment had been satisfied and was therefore no longer enforceable.

The statute recognizes a distinction between the filing of the judgment and its enforcement. Section 11–804 expressly permits the court to stay *enforcement* of the judgment for various reasons, including "any ground on which enforcement of a judgment of the court of this State would be stayed, . . . ." § 11–804(b). That distinction has also been recognized in our case law. *See Mike Smith Pontiac, GMC, Inc. v. Mercedes–Benz,* 356 Md. 542, 562, 741 A.2d 462, 472–73 (1999), where, after noting that some defenses challenge the validity of the foreign judgment while others accept the validity of the judgment and challenge only its enforcement, we concluded:

> "The distinction between recognition and enforcement applies in the instant case. Smith did indeed domesticate its Florida District judgment by filing under Maryland's [Uniform Enforcement of Foreign Judgments Act]. While this Court must recognize this judgment as a valid Maryland judgment, this Court also may inquire into post-judgment defenses in order to determine the extent to which it is enforceable."

*See also Guinness PLC v. Ward,* 955 F.2d 875 (4th Cir.1992), as discussed in *Smith Pontiac.*

■ In recognition of this distinction, which proceeds from the statute itself, it is clear that the mere filing of the Loudoun County judgment with the Clerk of the Circuit Court for Howard County does not establish the enforceability of that judgment and therefore would not bar appellees, under any notion of *res judicata,* collateral estoppel, or finality of judgment from challenging its enforceability by reason of a post-judgment act that would have the effect of discharging or satisfying the judgment. We thus turn to that prong of appellants' claim or issue preclusion argument.

 The doctrine of claim preclusion, or *res judicata,* "bars the relitigation of a claim if there is a final judgment in a previous litigation where the parties, the subject matter and causes of action are identical or substantially identical as to issues actually litigated and as to those which could have or should have been raised in the previous litigation." *Board of Ed. v. Norville,* 390 Md. 93, 106, 887 A.2d 1029, 1037 (2005). *See also Alvey v. Alvey,* 225 Md. 386, 390, 171 A.2d 92, 94 (1961) and *Lizzi v. WMATA,* 384 Md. 199, 206–07, 862 A.2d 1017, 1022 (2004). The doctrine embodies three elements: (1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the current action is identical to that determined or that which could have been raised and determined in the prior litigation; and (3) there was a final judgment on the merits in the prior litigation.

 Issue preclusion, or collateral estoppel is a somewhat allied doctrine, but it looks to issues of fact or law that were actually decided in an earlier action, whether or not on the same claim. We have articulated the doctrine thusly: "When an issue of fact or law is actually litigated and determined by a valid and final judgment, ... the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Janes v. State,* 350 Md. 284, 295, 711 A.2d 1319, 1324 (1998); *Murray International v. Graham,* 315 Md. 543, 547, 555 A.2d 502, 504 (1989).

 Both doctrines hinge, in part, on there having been a final judgment in the earlier litigation, and therein lies the problem with appellants' argument. Their action in Howard County was to attach or sequester Rice's alleged one-third interest in Mid–Atlantic and to garnish any moneys due him by reason of that interest. An attachment is implemented by a writ of execution that is levied by the sheriff against specific property of a judgment debtor. *See* Maryland Rules 2–641 and 2–642. Unless the property is released from the levy, it may be sold at a public sale, and the net proceeds, to the extent of the judgment lien, will be paid to the judgment

creditor. A garnishment is used to attach property of the judgment debtor that is in the possession of a third party. The procedure for garnishing property, other than wages or a partnership interest subject to a charging order under Rule 2–649, is set forth in Maryland Rule 2–645. The end result, if the judgment creditor is successful, is that any property found to belong to the debtor is turned over to the creditor.

Sequestration is an ancient equitable remedy initially designed to enforce equity decrees mandating or prohibiting specific conduct. Although in some jurisdictions it apparently has been expanded to include the enforcement of money judgments as well, in Maryland it remains limited to injunctive-type judgments. Maryland Rule 2–648(a) provides that "[w]hen a person fails to comply with a judgment *prohibiting or mandating action,* the court may order the seizure or sequestration of property of the noncomplying person to the extent necessary to compel compliance with the judgment and, in appropriate circumstances, may hold the person in contempt pursuant to Rules 15–206 and 15–207." (Emphasis added). The Rule continues that, if the person fails to comply with a judgment mandating conduct, the court may direct that the act be performed by some other person appointed by the court, and, if the mandate is for the payment of money, the court may enter a money judgment to the extent of the amount owed." The Loudoun County judgment sought to be enforced in Howard County was a "money judgment," as defined in Rule 1–202(p), and not a judgment prohibiting or mandating action. It did not order Rice to do, or refrain from doing, anything.

 Putting aside the inappropriateness of sequestration as a means of enforcing the Loudoun County judgment, the Confirmatory Order entered by the Howard County court did not purport to decide whether appellants were entitled to have the alleged interest of Rice in Mid–Atlantic applied to the judgment, and it therefore was clearly not a final judgment. That Order did no more than freeze the situation by precluding Rice or any other person from disposing of or jeopardizing

the interest until the court could sort out, through a trial, who owned the interest and whether appellants were entitled to have it applied to their judgment. A trustee was appointed to take control of the interest and investigate and ascertain its nature.

Although, as noted, the parties have not favored us with any indication of what, if anything, further has occurred in the Howard County court with respect to that action, it seems evident from the Confirmatory Order itself that further proceedings were contemplated and would, indeed, be necessary before any definitive ruling could be made with respect to whether Rice had an interest that was subject to attachment, garnishment, or sequestration. Because no final judgment was entered on that issue, no ruling entered in Howard County, including the Confirmatory Order, could suffice to support a claim of either *res judicata* or collateral estoppel. The Circuit Court for Montgomery County therefore did not err in allowing appellees to argue that the Loudoun County judgment had been satisfied by reason of the accord and satisfaction.

### Effect of Accord and Satisfaction

To determine whether the March, 2004 settlement agreement entered into by R & D, Abrams, and Kampa, captioned Accord and Satisfaction, served to satisfy the judgment and thereby preclude any enforcement action against Rice, it is necessary to look at the nature of that agreement in light of the two Virginia statutes. We have already given a skeletal outline of the agreement, but its terms have meaning only if put in context, and that requires an identification and examination of the relevant interests and entities. Unfortunately, the record extract and appendices, in addition to their other substantial shortcomings, fail to indicate what some of those interests are. No definitive findings seem to have been made by any of the courts, and the only explanation we have for some of these facts come from verified allegations by Rice.

As best we can tell, the *dramatis personae* are as follows:

(1) Broad Run Golf, LLC (Broad Run) is a Maryland limited liability company (LLC), whose members are Kampa, Rice, and Smyth, each with a one-third interest. The entity in which R & D made its investment is identified as New Broad Run Golf LLC, in which Abrams, Kampa, Rice, and Smyth were the principals, but we are unable to find an explanation of when that entity was created or what, if any, connection it had to Broad Run. As noted, Broad Run (or New Broad Run) intended to develop the *Bear National Golf Course.*

(2) Mid–Atlantic is a Delaware LLC whose members are Broad Run, which had a 55% interest, and STP–Beacon Hill, a Massachusetts LLC (Beacon Hill), which owned the remaining 45%.

(3) Beacon Hill, also a Massachusetts LLC, was, until March, 2004, owned by Abrams (99%) and his son (1%).

(4) New STP–Beacon Hill LLC (New Beacon Hill) is a Delaware LLC that owns the *Beacon Hill Golf Course* in Loudoun County. Its sole member is Mid–Atlantic.

(5) Cottages at Beacon Hill (Cottages) is a Delaware LLC. The members were Abrams, Kampa, Rice, and Smyth.

(6) R & D 1, LLC (R & D 1) and R & D 2001, LLC (R & D) are Virginia LLCs, of which Gregory is allegedly the managing member. Who owns them is not clear. R & D was the plaintiff in the Loudoun County case.

(7) NAP Foundation (NAP) is a Virginia non-stock, not for profit corporation of which Gregory is trustee and president. At some point, not clear from the record, R & D assigned part of its Loudoun County judgment to NAP.

It appears that, in the Fall of 2002, New Beacon Hill owned a 340–acre tract of land in Loudoun County, which it proposed to develop as a golf course. As best we can tell, this was a different golf course than the Bear National Golf Course being developed by Broad Run or New Broad Run. The tract consisted of two parcels, one of approximately 330 acres and one of 10.6 acres. Rice contends that the 330–acre parcel was to be used for the golf course and the 10.6–acre parcel was to

be used for a clubhouse and some cottages intended as amenities to the golf course. In November, 2002, just prior to the closing of a $10.5 million construction loan to be used to finance development of the golf course, Abrams, on behalf of New Beacon Hill, deeded the 10.6–acre parcel to Cottages. It is alleged that he did so without the knowledge of Rice or Smyth who, as noted, together owned two-thirds of Mid–Atlantic, which, in turn, was the sole member of New Beacon Hill, and without any authority.

In January, 2003, the lawsuit that produced the judgment at issue here was filed by R & D. In November, 2003—while that suit was pending—Abrams, with the concurrence of Smyth and Rice, caused Cottages to convey the 10.6–acre parcel to R & D 1, which put Abrams in control of it. That, according to Rice, severely restricted the ability of New Beacon Hill to develop the amenities necessary for a private golf course and thus to sell the course.

In March, 2004, Abrams and Kampa entered into the settlement agreement with R & D. As noted, that agreement had four elements to it. The first element was designed to remove Abrams and Mid–Atlantic entirely from any interest in or control over the golf course being developed by Beacon Hill. That was to be accomplished by (1) an assignment by Abrams and Beacon Hill of their interests in Mid–Atlantic, the sole member of New Beacon Hill., to Kampa, so that Mid–Atlantic would thereafter be owned 55% by Broad Run and 45% by Kampa, (2) an assignment by Abrams to Kampa of all interest Abrams had in New Beacon Hill and the golf course, (3) a release by Abrams to Kampa of all interests Abrams had in any contracts related to the golf course, and (4) Abrams's resignation as a manager of New Beacon Hill. The Assignment recited that its express intent was that Abrams and Mid–Atlantic would no longer have any ownership or other interest in New Beacon Hill or the golf course being developed by New Beacon Hill. It stated that the substitution of Kampa for Abrams was intended to "help facilitate the future development of the [Beacon Hill] Golf Course and the financial status

of [New Beacon Hill], both of which are potential assets that may help generate future revenues to repay the judgment."

The second element was a mutual release of contract obligations between Cottages and R & D 1 and concerned the November, 2003, conveyance of the 10.6–acre parcel from Cottages to R & D 1. The release recited that the contract leading to that conveyance contained certain post-closing obligations, which it did not define, and it purported to confirm the conveyance but release each entity from those post-closing obligations. The release noted that Rice and Smyth, two of the members of Cottages, were not signing the release and stated that R & D 1 accepted the consequences. The third element was a promissory note from Abrams and Kampa to R & D for $175, 000, together with 12% annual interest, due March 1, 2005. That note has not been paid and, according to Rice, was never intended by the parties to be paid. Finally, there was the Consent Order setting aside the judgment against Abrams and Kampa.

Appellants contend that the settlement agreement, captioned Accord and Satisfaction, was merely in the nature of a joint tort-feasor release and is governed by Va.Code, § 8.01–35.1. That statute deals with the situation in which "a release or a covenant not to sue is given in good faith to one of two or more persons liable in tort for the same injury." In that event:

(1) The release or covenant not to sue "shall not discharge any of the other tort-feasors from liability for the injury . . . unless its terms so provide; but any amount recovered against the other tort-feasors or any one of them shall be reduced by any amount stipulated by the covenant or the release, or in the amount of the consideration paid for it, whichever is the greater";

(2) "In determining the amount of consideration given for a covenant not to sue or release for a settlement which consists in whole or in part of future payment or payments, the court shall consider expert or other evidence as to the present value

of the settlement consisting in whole or in part of future payment or payments";

(3) The release or covenant not to sue "shall discharge the tort-feasor to whom it is given from all liability for contribution to any other tort-feasor"; and

(4) A tortfeasor who enters into such a release or covenant not to sue "is not entitled to recover by way of contribution from another tort-feasor whose liability for the injury ... is not extinguished by the release or covenant not to sue, nor in respect to any amount paid by the tort-feasor which is in excess of what was reasonable."

Appellees view § 8.01–35.1 as applicable only to pre-judgment settlements in the form of releases or covenants not to sue. An accord and satisfaction, they urge, is not a release or covenant not to sue. The statute governing an accord and satisfaction, they contend, where consideration is paid by one judgment debtor on a judgment entered jointly and severally against more than one judgment debtor, is Va.Code, § 8.01–443. That statute permits a judgment creditor to bring actions on the judgment against any or all of the judgment debtors, jointly or severally, and "no bar shall arise as to any of them by reason of a judgment against another, ... until the judgment has been satisfied." Section 8.01–443 further provides:

"If there be a judgment against one or more joint wrongdoers, the full satisfaction of such judgment *accepted as such by the plaintiff* shall be a discharge of all joint wrongdoers, except as to the costs; provided, however, this section shall have no effect on the right of contribution between joint wrongdoers as set out in § 8.01–34."

(Emphasis added).

Appellees argue that the consideration stated in the "accord and satisfaction" between R & D, Abrams, and Kampa, and the accompanying assignment, mutual release, promissory note, and consent order, was accepted by R & D as a full satisfaction of the judgment, and, for that reason, discharged Rice as well. In making his own settlement, for $1,000,000,

they claim, Smyth was simply an unwise volunteer; he, too, had been discharged by the accord and satisfaction.

The two statutes express different, but entirely consistent, principles. As pointed out in *Hayman v. Patio Products, Inc.*, 226 Va. 482, 311 S.E.2d 752, 755 (1984), under Virginia common law, "a release of, or an accord and satisfaction with, one of several joint tort-feasors operated as a release of all" even if the agreement provided otherwise. A covenant not to sue one joint tortfeasor did not have that effect, however; it did not release the other joint tortfeasors. *See also Perdue v. Sears, Roebuck and Co.*, 694 F.2d 66 (4th Cir.1982).[10]

As initially enacted in 1979, § 8.01–35.1 applied only to covenants not to sue, but, as subsequently amended, it now applies to both kinds of instrument and thus, for these purposes, treats them the same. A good faith settlement with a joint tortfeasor, whether by release or covenant not to sue, does not release the other joint tortfeasors unless the release or covenant so provides, but it does protect them by reducing their liability to the extent of the consideration paid by the settling tortfeasor or the amount provided in the release or covenant, whichever is greater, and by discharging them from liability for contribution to the settling tortfeasor. We see nothing in the statute to suggest that it is limited to pre-judgment settlements, as averred by appellees, and that it cannot apply when one of several persons jointly and severally liable on a judgment effects a settlement of that person's liability under the judgment. The obvious thrust of the statute, confirmed by the courts that have interpreted it, was to promote settlements,[11] and that goal would seem to be as

---

**10.** The distinction, as explained in *Shortt v. Hudson Supply & Equipment Co.*, 191 Va. 306, 60 S.E.2d 900, 903 (1950) was that a release was "an immediate relinquishment or discharge of the covenantor's right of action, whereas a covenant not to sue is merely a promise not to prosecute a suit against the covenantee, and is enforceable only by the latter."

**11.** *See Hayman, supra*, 226 Va. 482, 311 S.E.2d 752, 755; also *Dacotah Marketing and Research, L.L.C. v. Versatility, Inc.*, 21 F.Supp.2d 570, 575 and n. 9 (E.D.Va.1998).

applicable to settling liability under joint and several judgments as to settling pre-judgment claims against alleged joint tortfeasors. We therefore do not agree that § 8.01–35.1 applies only to pre-judgment settlements.[12]

The underlying premise of § 8.01–35.1, however, is that, in the post-judgment context, the consideration paid by the settling judgment debtor does not, and is not intended to, satisfy the judgment in full, for if that were not the case, the provisions preserving but reducing the liability of the other judgment debtors would be meaningless. The function of the statute seems to be to allow a plaintiff, before or after judgment, to enter into settlements with one or more defendants or judgment debtors without affecting the plaintiff's right to proceed against the others for the balance of what is owed, or believed to be owed. That is also the law in Maryland. As this Court pointed out in *Trieschman v. Eaton, supra,* 224 Md. 111, 119, 166 A.2d 892, 896 (1961), neither an unsatisfied judgment held against one tortfeasor nor the partial satisfaction of a judgment against one tortfeasor serves to discharge other tortfeasors liable for the same harm.

Section 8.01–443 is entirely consistent with that view. The first part of it permits a plaintiff to pursue to judgment claims against any or all joint wrongdoers, jointly, severally, and successively, until the judgment has been satisfied. That pursuit ends, however, when a judgment against one or more joint wrongdoers is fully satisfied; the "full satisfaction of

---

**12.** Because we are called upon to construe a Virginia statute, we make these pronouncements with somewhat less assurance than if we were interpreting a Maryland statute. Obviously, it is for the Virginia Supreme Court ultimately to determine the scope of § 8.01–35.1. At this point, we are aware of no precedential Virginia case on the issue. We do note that the case law generally under versions of the Uniform Contribution Among Tortfeasors Act does not draw such a clear line between pre-judgment and postjudgment settlements. It is not infrequent that joint tortfeasor releases of one kind or another are given in situations in which the plaintiff has recovered a judgment against one joint tortfeasor but not against another, and, subject to differing rules governing contribution, courts have applied the statute to those situations. *See Trieschman v. Eaton,* 224 Md. 111, 119, 166 A.2d 892, 896 (1961).

such judgment *accepted as such by the plaintiff* shall be a discharge of all joint wrongdoers, except as to the costs." (Emphasis added). That carries forth the well-established common law view that there can be but one satisfaction of the same wrong. The Revisor's Note to § 8.01–443 confirms that the statute was intended to make clear that "discharge of all joint tort-feasors, except as to costs, occurs only when one of multiple judgments *has been fully satisfied and has been accepted as such by the plaintiff.*" (Emphasis added). The Revisor's Note continues that " '[s]atisfaction' is determined by case law and in an appropriate situation would include, besides full payment, an accord and satisfaction or a covenant not to sue supported by consideration."

The issue, then, is not *which* statute applies; they *both* may apply. The question is whether the March, 2004 agreement, captioned and later referred to as an accord and satisfaction, actually constituted, and was accepted by R & D as, a full satisfaction of the judgment against Abrams, Kampa, Rice, and Smyth. If so, Rice was discharged; if not, he remains liable, subject to the credits required by § 8.01–35.1.

■ The Circuit Court resolved that issue on summary judgment, and, on this record, that was error. There are material facts in genuine dispute. That the parties referred to the agreement as an accord and satisfaction is certainly relevant in determining their intent, but it is not dispositive, especially when the Consent Order contemplated by the agreement, and upon which the agreement was expressly contingent, very clearly states that it "shall have no effect" on either the claims or the judgment against Rice and Smyth.

Also bearing significantly on whether R & D "accepted" the accord and satisfaction as a full satisfaction of the judgment is the statement in the assignment by Abrams and Beacon Hill that the removal of Abrams was intended to facilitate the development of the Beacon Hill golf course and the financial status of New Beacon Hill, "both of which are potential assets that may help generate future revenues *to repay the judgment.*" (Emphasis added). That is certainly an indication

that R & D did *not* regard the judgment as fully satisfied. Obviously, Smyth did not believe that the judgment was fully satisfied, as he paid $1,000,000 to secure his own release from it.

There is no independent evidence in this record to indicate what value R & D placed on either the assignment of Abrams's interests, which were to Kampa, not R & D, or on the mutual release of contract rights relating to the conveyance of the 10.6–acre parcel. The only monetary consideration referenced in the settlement agreement was an unsecured promissory note for $175,000 that has not been paid. On this record, it cannot properly be determined, as a matter of law, that the accord and satisfaction constituted, and was accepted by R & D as, a full settlement of the judgment.

JUDGMENT OF CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEES.