Justin Davis v. Wicomico County Bureau, No. 46, Sept. Term, 2015 Opinion by Battaglia, J.

**CIVIL PROCEDURE - RES JUDICATA**
A party's failure to appeal a judgment entered against him in 2011 in a child-support enforcement proceeding in which the hearing Judge found that his execution of an affidavit of parentage was not the result of fraud, duress, or material mistake of fact precludes his ability under *res judicata* to relitigate his claim two years later in which he contested legal parentage based on the affidavit of parentage.

**FAMILY LAW – AFFIDAVIT OF PARENTAGE – MD. CODE ANN., FAMILY LAW § 5-1028 (1984, 2006 Repl. Vol.)**

The statute that provides for the creation of legal parentage by an unmarried father when he executes an affidavit of parentage, pursuant to Section 5-1028 of the Family Law Article of the Maryland Code, establishes a conclusive presumption of paternity that may only be challenged within a 60-day time period from the time the affidavit is executed, or thereafter, upon a showing of fraud, duress, or material mistake of fact.

Circuit Court for Wicomico County, Maryland
Case No. 22-C-11-1097
Argued: January 8, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 46
September Term, 2015

---

JUSTIN DAVIS

v.

WICOMICO COUNTY BUREAU

---

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Rodowsky, Lawrence F.
(Retired, Specially
Assigned)
JJ.

---

Opinion by Battaglia, J.
Adkins, J., concurs.
Barbera, C.J., McDonald and Watts, JJ. dissent.

---

Filed: April 25, 2016

*Battaglia, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Justin Davis, Petitioner, twice sought to secure a paternity test years after he had executed an Affidavit of Parentage, in which he attested, shortly following the birth of twin boys in 2009, that he was their father. The Wicomico County Bureau of Support Enforcement ("Bureau"), Respondent, in 2011, had filed a Complaint for Child Support against Mr. Davis, in which it alleged that Mr. Davis was responsible for support, because he had attested that he was the father of the twins; Mr. Davis, in turn, requested a paternity test and denied parentage of the children, alleging that his signature on the affidavit had been obtained through fraud or misrepresentation. Judge David B. Mitchell, then retired but specially sitting in the Circuit Court for Wicomico County, ordered Mr. Davis to pay child support; he also denied the request for a paternity test, because Mr. Davis had executed the affidavits of parentage and there was "nothing in this record and before this Court today that would even broach the subject of fraud, duress, or material mistake of fact." Mr. Davis did not note an appeal.

Two years later, Mr. Davis, however, filed a "Complaint for Blood Test, to Challenge Finding of Paternity (By Affidavit of Parentage), and to Set Aside Child Support Order" in the Circuit Court for Wicomico County. Judge Donald C. Davis denied the request for a paternity test, concluding that "[Mr. Davis] has no absolute right to blood or genetic testing under FL § 5-1038; even if he did, he has waived his right by failing to appeal the trial judge's decision in 2011; and there is no other meritorious basis asserted to grant [Mr. Davis] his requested relief."

Mr. Davis then appealed to the Court of Special Appeals, which, in a reported opinion, affirmed.[1] 222 Md. App. 230, 112 A.3d 1024 (2015). Our brethren concluded that Mr. Davis's claims were barred by *res judicata*, but also reached the merits. Judge Patrick L. Woodward, writing on behalf of the Court, in interpreting the statutes in issue, held that "the plain language and the legislative history of FL §§ 5-1028 and 5-1038 support the trial court's determination" that Mr. Davis "is not entitled to a blood or genetic test." *Id*. at 246, 112 A.3d at 1033.

We granted *certiorari*, 444 Md. 638, 120 A.3d 766 (2015), to consider the following questions:

> 1. Is blood or genetic testing mandated when demanded by a putative father who, from the beginning of the legal process, presents evidence of fraudulent affidavits of parentage?
> 2. Does extrinsic evidence of fraud exist where the state's attorney actively participates in the deception and fraud without disclosing it to the putative father or to the trial court during two trials?[2]

With respect to the seminal issue of *res judicata* as to whether the 2011 child support order from which Mr. Davis did not appeal precludes him from relitigating the same claims in 2013, we have defined *res judicata* as:

---

[1] Before the Court of Special Appeals, Mr. Davis presented the following questions:
> 1. Did the circuit court err by granting the Bureau's motion for summary judgment?
> 2. Did the circuit court err in finding that FL §§ 5-1029 and 5-1038 do not grant appellant an automatic right to a paternity test?

[2] Because Judge Mitchell held that Mr. Davis did not meet his burden of proving fraud, duress or material mistake of fact during the first hearing and because we also hold that Mr. Davis's claims are barred by *res judicata*, we do not reach the second issue.

2

> [A] judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit. . . .

*Prince George's County v. Brent*, 414 Md. 334, 342, 995 A.2d 672, 677 (2010), quoting

*MPC, Inc. v. Kenny*, 279 Md. 29, 32, 367 A.2d 486, 488-89 (1977). The requirements of

the doctrine of *res judicata* are:

> (1) that the parties in the present litigation are the same or in privity with the parties to the earlier dispute; (2) that the claim presented in the current action is identical to the one determined in the prior adjudication; and (3) that there was a final judgment on the merits.

*Colandrea v. Wilde Lake Community Ass'n, Inc.*, 361 Md. 371, 392, 761 A.2d 899, 910

(2000). *Res judicata* "avoids the expense and vexation attending multiple lawsuits,

conserves the judicial resources, and fosters reliance on judicial action by minimizing the

possibilities of inconsistent decisions." *Cochran v. Griffith Energy Services, Inc.*, 426

Md. 134, 140, 43 A.3d 999, 1002 (2012), quoting *Anne Arundel County. Bd. of Educ. v.*

*Norville*, 390 Md. 93, 106-07, 887 A.2d 1029, 1037 (2005).

Mr. Davis does not dispute that the parties in the 2011 and 2013 cases are the

same, nor that the claims were identical in both. Rather, he argues that *res judicata*

should not bar his 2013 Complaint, because the equitable, remedial nature of paternity

actions requires continuous vigilance by the judiciary, so that there cannot be a final

judgment against which *res judicata* is measured.

A final judgment is "a judgment, decree, sentence, order, determination, decision,

or other action by a court . . . from which an appeal . . . may be taken", according to

Section 12-101(f) of the Courts and Judicial Proceedings Article. We have stated that, "[a] ruling of the circuit court, to constitute a final judgment, must, among other things, be an 'unqualified, final disposition of the matter in controversy.'" *Addison v. Lochearn Nursing Home, LLC*, 411 Md. 251, 262, 983 A.2d 138, 145 (2009), quoting *Gruber v. Gruber*, 369 Md. 540, 546, 801 A.2d 1013, 1016 (2002).

In the present case, Judge Mitchell's order requiring Mr. Davis to pay child support and denying his request for a paternity test was a final judgment. Mr. Davis, of course, argues that because the Court continues to have jurisdiction over child support and parentage, that the order could not be final. Although we have specifically not opined about this subject, Judge Alan Wilner, then writing on behalf of the Court of Special Appeals, recognized that, "[a]n order establishing child support, or determining any other matter over which a continuing jurisdiction exists, if possessing all other required attributes of finality, is a judgment (*see* Md. Rule 1-202([o])). . . ." *Haught v. Grieashamer*, 64 Md. App. 605, 611, 497 A.2d 1182, 1185 (1985). Maryland Rule 1-202(o) defines judgment as "any order of court final in its nature entered pursuant to these rules." Therefore, we agree with the Court of Special Appeals that *res judicata* would have barred the 2013 action.

The dissent, however, raises an argument never raised below before Judge Davis in 2013, nor before the Court of Special Appeals, that *res judicata* would not have barred the 2013 action, because Judge Mitchell in 2011 allegedly never addressed Mr. Davis's claim for genetic testing. In the 2011 action, however, there were two issues queued up for decision by Judge Mitchell: one brought on behalf of the twins as to whether Mr.

4

Davis should be ordered to pay child support and the other raised by Mr. Davis, as to

whether Mr. Davis should have been afforded a genetic test because of alleged fraud in

Section 5-1028(d)(2)(i) governing whether an affidavit of parentage was subject to attack.

With respect to Mr. Davis's claim, he repeatedly argued that he had been the victim of

fraud and requested genetic testing:

> [BUREAU]: But it's my understanding Mr. Davis would like to present argument to the Court today to challenge the validity of those Affidavits under the Paternity Statute.
>
> *          *          *
>
> [MR. DAVIS]: This is the whole reason we are here. The only thing I'm asking for is a paternity test to prove that I actually have an obligation to these children legally.
>
> [THE COURT]: All right.
>
> [MR. DAVIS]: That's the only thing I'm asking for. I'm not asking for anything else. I'm just asking for a paternity test to actually prove paternity. That's the only thing I want, Judge.
>
> *          *          *
>
> [MR. DAVIS]: I'm not sure – I'm not sure on the actual timing. The only thing that I think is relevant here is the fact that I'm just asking for a paternity test. That's it. I'm not trying to get out of any – I just want a paternity test so you guys can see if I'm actually the father.
>
> *          *          *
>
> [MR. DAVIS]: She could have deceived me when we were together. I'm not – I wasn't with her 24/7. The only thing I'm asking for once again, I reiterate is – is a paternity test.
>
> *          *          *
>
> [MR DAVIS]: I just want a paternity test to prove in front of the Judge and the eyes of the law to make it legal that I am the father – if you prove to me

5

legally that I'm the father, you can bring me back in here and I will pay all the child support you want. . . . That's – I just want a paternity test. I'm not asking to get out of something. I want – can you just prove to me that they're my children?

* * *

[MR. DAVIS]: So in this case, I'm just asking for a paternity test. That's it. I'm asking for a paternity test to actually prove paternity.

Judge Mitchell specifically responded to Mr. Davis's repeated requests for a paternity test when he denied the existence of fraud at the time Mr. Davis executed the affidavit:

Thank you. . . . The statute authorizing the creation of these affidavits is found in Family Law Article Section 5-1028. In essence, for a period of 60 days after you sign the affidavit, you have the right to rescind it. You can rescind it in writing, or you can rescind it in a judicial proceeding provided that proceeding occurs within 60 days of the birth of the child or the execution of the affidavit. Beyond that 60-day period of time, the statute provides that you may rescind the Affidavit of Paternity and its contents only upon a showing of fraud, duress, or a material mistake of fact.

The issue in this case is not the fatherhood of the child. The issue in this case is whether there is the presence of fraud, mistake, or duress that would justify the rescission of an Affidavit signed by you and acknowledged to be signed by the defendant wherein he confesses to the paternity of these two children.

There is no dispute that the mother and the defendant executed these documents. There is no suggestion of the presence of any fraud or any duress at the time they executed the document.

There is testimony from the mother before the Court that she advised the defendant prior, seven months actually, prior to the birth of the children that he was not the biological father. That's interesting but irrelevant. It's irrelevant because the defendant armed with whatever knowledge he had chose to voluntarily execute an affidavit establishing him as the father of these children. We have heard nothing in this record and before this Court today that would even broach the subject of fraud, duress or material mistake of fact. . . .

We don't slip in and slip out. You were clearly – you meaning, both mother and father, were clearly advised, don't sign if you have a doubt. You can get assistance if you want because you don't understand what you're about to sign. But the moment you affix your pen to that paper and sign your name, you have obligated yourself to these children. And it is the

6

finding of this Court that there is no fraud, duress, or mistake of material fact that would justify the rescission of the Affidavits of Parentage properly executed. These are your children by law, and that's the end of the story.

Although the dissent argues that *res judicata* would not apply because genetic testing was not a specific claim in issue, Mr. Davis's suit in 2013 for paternity testing to challenge the finding of paternity was barred, either under claim preclusion[3] or issue preclusion,[4] because the issue was litigated in 2011.

In a case analogous to the instant case, *Hardy v. Hardy*, 380 S.W.3d 354 (Ark. 2011), Mr. Hardy sought to set aside a divorce decree, which included provisions addressing child custody and his support of the children, on a theory of fraud. In the divorce proceedings, his wife's complaint alleged that two children had been born of the marriage. *Id*. at 355. Mr. Hardy denied paternity of one of the children who had been conceived prior to, but born during, the marriage, and asked for a paternity test. *Id*. The trial court denied Mr. Hardy's request for a paternity test, awarded him visitation, and ordered him to pay child support. *Id*. at 358. Mr. Hardy did not appeal from "the denial of

---

[3] Claim preclusion "'bars the relitigation of a claim if there is a final judgment in a previous litigation where the parties, the subject matter and causes of action are identical or substantially identical as to issues actually litigated and as to those which could have or should have been raised in the previous litigation'". *R & D 2001, LLC v. Rice*, 402 Md. 648, 663, 938 A.2d 839, 848 (2008), quoting *Anne Arundel Cnty. Bd. of Educ. V. Norville*, 390 Md. 93, 106, 887 A.2d 1029, 1037 (2005).

[4] Issue preclusion, also called collateral estoppel, "looks to issues of fact or law that were actually decided in an earlier action, whether or not on the same claim." *R & D 2001, LLC*, 402 Md. at 663, 938 A.2d at 849.

his motion for paternity testing or from the divorce decree that required him to make child-support payments for [the child]." *Id*.

Mr. Hardy, however, years later, moved to set aside the divorce decree, arguing that he was not the father of the child based on a paternity test he had commissioned. *Id*. The trial court denied Mr. Hardy's motion for declaratory judgment, and Mr. Hardy appealed, arguing that *res judicata* did not bar the second proceeding because the divorce proceeding did not involve "an express finding that he was the father of [the child]." *Id*. The Arkansas Supreme Court determined, as we do here with respect to Mr. Davis, that Mr. Hardy's relitigation of the issue of paternity was barred by the claim preclusion aspect of *res judicata* because the "case is based on the same events as the subject matter of the previous lawsuit." *Id*. 358. The court reasoned that, "the issue of paternity was clearly litigated in the divorce proceeding", there was a final judgment and Mr. Hardy's failure to appeal the rulings in the divorce proceeding "foreclose[d] his present collateral attack upon the finding of paternity." *Id*. at 358-60.

We, however, did not take this case to address *res judicata*, but, rather, to determine whether a paternity test is mandated when "demanded" four years after the birth of twins by a father who had executed an affidavit of parentage when the children were born.

8

When Mr. Davis executed the Affidavit of Parentage, Section 5-1028 of the Family Law Article of the Maryland Code (1984, 2006 Repl. Vol.)[5] governed and provided then, as it does now, that:

(a) An unmarried father and mother shall be provided an opportunity to execute an affidavit of parentage in the manner provided under § 4-208 of the Health - General Article.

(b) The affidavit shall be completed on a standardized form developed by the Department.

(c)(1) The completed affidavit of parentage form shall contain:

(i) in ten point boldface type a statement that the affidavit is a legal document and constitutes a legal finding of paternity;

(ii) the full name and the place and date of birth of the child;

(iii) the full name of the attesting father of the child;

(iv) the full name of the attesting mother of the child;

(v) the signatures of the father and the mother of the child attesting, under penalty of perjury, that the information provided on the affidavit is true and correct;

(vi) a statement by the mother consenting to the assertion of paternity and acknowledging that her cosignatory is the only possible father;

(vii) the Social Security numbers provided by each of the parents.

(2) Before completing an affidavit of parentage form, the unmarried mother and the father shall be advised orally and in writing of the legal consequences of executing the affidavit and of the benefit of seeking legal counsel.

(d)(1) An executed affidavit of parentage constitutes a legal finding of paternity, subject to the right of any signatory to rescind the affidavit:

(i) in writing within 60 days after execution of the affidavit; or

(ii) in a judicial proceeding relating to the child:

1. in which the signatory is a party; and

2. that occurs before the expiration of the 60-day period.

(2)(i) After the expiration of the 60-day period, an executed affidavit of parentage may be challenged in court only on the basis of fraud, duress, or material mistake of fact.

---

[5] All references to the Family Law Article are to the Maryland Code (1984, 2006 Repl. Vol.), unless stated otherwise.

(ii) The burden of proof shall be on the challenger to show fraud, duress, or material mistake of fact.

(iii) The legal responsibilities of any signatory arising from the affidavit, including child support obligations, may not be suspended during the challenge, except for good cause shown.

(e) The Administration shall prepare written information to be furnished to unmarried mothers under § 4-208 of the Health – General Article concerning the benefits of having the paternity of their children established, including the availability of child support enforcement services.

(f) The Department shall make the standardized affidavit forms available to all hospitals in the State.

(g) The Secretary, in consultation with the Department of Health and Mental Hygiene and the Maryland Hospital Association, shall adopt regulations governing the provisions of this section and § 4-208 of the Health – General Article.

The Affidavit of Parentage executed by Mr. Davis and the mother of the twin boys in the hospital two days after the twins were born[6] was on a form developed by the Department of Health and Mental Hygiene; its front, in full, recited the following:

---

[6] Further, in the 2011 proceeding, Judge Mitchell aptly refuted Mr. Davis's contention that appearance is dispositive:

> The father proposes that the children don't look like him. The history of this world has demonstrated on too many occasions for us to recount that children born of two parents can emerge into the world looking like they did generations past. It's happened in England. It's happened in the United States of America. It's happened in the Republic of South Africa. It's happened in China. It will happen today. It will happen tomorrow. The basis of parentage is not how they look, but do you acknowledge them. Now, perhaps, a saying that can be found in many nations of Africa applies. In the United States, we used to call it children who were born out of wedlock illegitimate. In those African nations, the statement is that there are not illegitimate children. There are illegitimate parents. Now, what I have seen before me today is that I have seen illegitimate parents. This is not a game. These are children who have rights, and their rights are to be protected.

(continued . . . )

Rights and Responsibilities

1. You have a right to obtain genetic testing. If you have any doubts as to the paternity of this child, you should request genetic testing before signing the Affidavit. If you would like more information about genetic testing, please call the Maryland Child Support Enforcement Administration at (410) 767-7034.

2. A complete and signed Affidavit of Parentage creates a legal finding of paternity. No further legal action is required to establish paternity. The father's name will be placed on the child's birth certificates.

3. The legal parents of the minor child are the joint natural guardians of their minor child. This means that both parents are jointly responsible for the support of their child. It also means that the child will be able to benefit from the parents' health care coverage, receive inheritance, or receive Social Security or Veterans' dependent or survivor benefits, if eligible.

4. Once this Affidavit is signed by both parties, the father will have equal rights to custody of the child. If a dispute arises concerning issues of custody, visitation and child support, a court may use this Affidavit as evidence to resolve the dispute.

5. The personal information requested is required to establish paternity and/or to enable the Division of Vital Records to contact a parent in the event that the information provided on the Affidavit is insufficient.

6. The Affidavit will be filed with the Division of Vital Records, and will be available upon request to the parents, the legal guardian, and the Child Support Enforcement Administration. The information provided in the Affidavit may be used by the Child Support Enforcement Administration to assist in providing child support services to either parent.

7. The legal finding of paternity, established by completion of the Affidavit, can be reversed only if:
   a. Within 60 days of signing, either party named in the Affidavit signs a written rescission. (You may obtain a rescission form by calling the Maryland Department of Health and Mental Hygiene, Division of Vital Records at 410-764-3182);

( . . . continued)

b. Within 60 days of signing, either party named in the Affidavit appears in court in a proceeding related to the child and informs the court of his or her decision to rescind; or

c. After the expiration of the 60 day period, a court orders a rescission after the party challenging the Affidavit proves fraud, duress or material mistake of fact.

8. Rescission of the Affidavit will terminate the father/child relationship, but court action will be necessary to remove the man's name from the birth certificate.

9. If you challenge the Affidavit in court after the 60 day period, your legal responsibilities for the child, including child support obligations, will continue unless and until a court relieves you of those responsibilities.

The reverse side of the affidavit contained additional statements, which included:

**1. A complete Affidavit of Parentage is a legal document and constitutes a legal finding of paternity.**

2. Completion of the Affidavit is voluntary. Do not complete this Affidavit until you have read or have had read to you, the instructions for completion and the notice regarding your rights and responsibilities.

3. The Affidavit may not be signed by the biological mother if she was legally married at the time of conception or birth of the child. The Affidavit may be signed by the father regardless of his marital status.

4. If either of you is not sure that the man signing the Affidavit is the biological father of the child, you should not complete the Affidavit at this time. You should first have a genetic test. Genetic testing can provide certainty if you have any doubts regarding the parentage of the child.

5. If you are under the age of eighteen (18), you may complete the Affidavit without the permission of an adult or legal guardian. You may want to seek the advice of a parent or legal guardian before signing this form.

6. This Affidavit creates legal rights and obligations relating to your child, and may impact custody, child support and visitation. Therefore, it may be beneficial to talk to a lawyer before signing the Affidavit.

(Emphasis in original). The form, thereafter, contained Mr. Davis's name, address, date of birth, social security number, phone number, and his signature; printed above his signature were the following statements:

> *I acknowledge that I am the natural father of the child named above. I solemnly affirm under penalties of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information and belief. I understand that this affidavit will establish paternity of the child and will authorize the entry of my name on the child's birth certificate. I have read or had read to me the notice regarding the legal rights and obligations resulting from acknowledging paternity. I understand that I am free to refuse to sign this admission of paternity.*

The mother's signature appears on the form under a similar advisement.

Mr. Davis's Affidavit of Parentage, thus, notified him of the creation of legal rights and obligations. Pursuant to Section 5-1028 of the Family Law Article, Mr. Davis did not, however, rescind the affidavit within 60 days of its execution, nor did he appeal the 2011 judgment that determined that the affidavit of parentage was not procured through fraud, duress or material mistake of fact.

Mr. Davis, nevertheless, argues that he is entitled to a blood or genetic test as a result of his attempt to modify his paternity attestation, pursuant to our holding in *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000), which involved declarations of paternity entered by the circuit court and the effect of Section 5-1038 of the Family Law Article when a putative father requests modification or abdication of the order. Section 5-1038 states:

> (a)(1) Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.
> (2)(i) A declaration of paternity may be modified or set aside:

13

      1. in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity; or

      2. if a blood or genetic test done in accordance with § 5-1029[7] of this subtitle establishes the exclusion of the individual named as the father in the order.

(ii) Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

 (b) Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

Essentially, Mr. Davis urges that his attestation of paternity under Section 5-1028 is equivalent to a declaration of paternity entered by a circuit court under Section 5-1038 so that he is entitled to a blood or genetic test. The Bureau, conversely, argues that there are

---

[7] Section 5-1029 of the Family Law Article provides, in relevant part:

    (a)(1) The Administration may request the mother, child, and alleged father to submit to blood or genetic tests. (2) If the mother, child, or alleged father fails to comply with the request of the Administration, the Administration may apply to the circuit court for an order that directs the individual to submit to the tests.

    (b) On the motion of the Administration, a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child.

              *     *     *

    (i) Upon motion of the Administration or any party to the proceeding and due consideration by the court, the court shall pass a temporary order for the support of the child if:

    (1) a laboratory report establishes a statistical probability of paternity of at least 99.0%; and

    (2) the court determines that the putative father has the ability to provide temporary support for the child.

significant distinctions between the statutory sections, evidenced by their plain language and history. The Court of Special Appeals concurred with the Bureau when it stated:

> We agree with the trial court that the plain language of the statutes shows that the only way for [Mr. Davis] to set aside the finding of paternity established by his affidavit of parentage under FL § 5-1028 is fraud, duress, or material mistake of fact, and not by a blood test as requested by [Mr. Davis].

*Davis v. Wicomico County Bureau of Support Enforcement*, 222 Md. App. 230, 244, 112 A.3d 1024, 1032 (2015).

The plain language of Sections 5-1028 and 5-1038 differs significantly. Most importantly, Section 5-1028 permits rescission of the affidavit of parentage only "on the basis of fraud, duress, or material mistake of fact." To permit Mr. Davis to pursue blood or genetic testing in the face of the self-limiting language totally eviscerates the word "only." We, however, augment plain meaning analysis with the legislative history of the two statutes, which cements our conclusion that Mr. Davis cannot seek blood or genetic testing.

The historical origins of Section 5-1038 emanate from criminal statutes regarding bastardy and fornication, which, as early as 1781, provided:

> Be it enacted, by the general assembly of Maryland, that from and after the end of this present session of assembly, it shall and may be lawful for any justice of the peace within this state, as often as he shall be informed of any female person having an illegitimate child, to issue his warrant to the constable of the hundred in which such person resides, who is hereby required to carry such person before some justice of the peace of the county, who shall call on her for security to indemnify the county from any charge that may accrue by means of such child, and, upon neglect or refusal, to commit her to the custody of the sheriff of the county, to be by him safely kept until she shall give such security, but in case she shall on oath discover the father, then the said justice is hereby required to discharge

15

her from such warrant, and directed to call such father, if a resident of the county, before him, and shall cause him to give security in the sum of thirty pounds current money, to indemnify the county from all charges that may arise for the maintenance of such child; but in case the father be a resident of any other county within this state, then the justice shall transmit, under his hand and seal, a copy of the proceedings in such case had, and the justices to whom the said proceedings shall be sent, shall forthwith proceed against the father in manner and form as is before directed.

Provided always, that in case any person charged with being the father of a bastard child should think himself aggrieved by the judgment aforesaid, it shall and may be lawful for the said justice, and he is hereby required, to cause such person to enter into recognizance for his appearance at the next county court; and the justices of the said county court are hereby directed to take cognizance thereof, and such proceedings, shall thereupon be had as in other criminal cases; and if the person so charged be found guilty by the verdict of a jury, the court shall immediately order such person to give security to indemnify the county from any charges that may accrue for the maintenance of the said child; and if he shall neglect or refuse to give such security, he shall be committed to the custody of the sheriff until he comply; and any person swearing falsely in the premises shall suffer the same pains and penalties as persons guilty of willful and corrupt perjury.

1781 Maryland Laws, Chapter 13. Essentially, the mother of an illegitimate child was "arrested" and called upon to support the child, or in the alternative to identify the father, who was required to provide support or be successful in defeating the paternity claim after trial.

Bastardy proceedings continued until the early 1960s when the Commission to Study Problems of Illegitimacy among the Recipients of Public Welfare Monies in the Program for Aid to Dependent Children explored how to facilitate both the emotional and financial support of illegitimate children. The recommendations to the Legislature

16

included the rejection of bastardy laws,[8] which had survived since 1781, as well as the adoption of procedures to establish paternity, which would result in court orders after trial or after a settlement between the parties without the father having to admit paternity. Final Report of the Commission on the Problems of Illegitimacy 22-24 (December 6, 1961). Some of the pertinent language adopted by the Legislature in 1963 included the following:

> 66B
> (a) Except as hereinafter provided, every bill or petition filed pursuant to Section 66 of this Article with respect to an illegitimate child shall be supported by the oath of the woman who is pregnant with or has been delivered of such child, whether or not she is a formal party to said proceedings. If the woman is dead or otherwise physically or mentally incapable of making said oath or is she refuses to become the complainant or petitioner or to disclose the father of the child or to make such oath, the bill or petition may be filed without an oath, but the fact of the pregnancy or birth shall be verified by the complainant or petitioner and the woman if living, shall be made a party defendant.
>
> (b) No bill or petition shall be filed or received by the Clerk of the Court unless there is attached thereto the consent or authorization of the State's Attorney of the county or city where the same is to be filed, unless the Court directs otherwise after being satisfied by such affidavits and testimony as the Court deems sufficient that the complaint is bona fide and meritorious.

1963 Maryland Laws, Chapter 722. After a petition was filed, the court would hold a hearing in which the complainant had the burden of establishing that the putative father was in fact the father:

---

[8] The Report states, "It further recommends that the present bastardy law (Article 12 of the Annotated Code) be repealed. . . . " Final Report of the Commission on the Problems of Illegitimacy 22 (December 6, 1961).

66F
(b) At any time after the birth of the child a hearing shall be held by the Court in which the bill or petition is filed without a jury, unless the defendant alleged to be the father of the child elects a jury trial as hereinafter provided. Both the mother and the putative father are competent to testify, but the defendant alleged to be the putative father shall not be compelled to give evidence and the burden is upon the petitioner or complainant to establish by the weight of evidence required in other civil cases, that the defendant is the father of the child or children in question. . .

1963 Maryland Laws, Chapter 722. The court was mandated to order the parties to submit to blood tests to determine whether the putative father could be excluded as the father, upon request by the putative father or upon the court's own motion:

66G
The Court, upon motion of the defendant alleged to be the putative father, or upon its own motion, shall order the mother and the child, as well as the defendant to submit to such blood tests as may be deemed necessary to determine whether or not the defendant can be excluded as being the father of the child. . . .

1963 Maryland Laws, Chapter 722.

Once a paternity finding was entered, Section 66H(a) mandated that the Court declare "the defendant to be the father" and order him to pay child support for the maintenance of the child:

66H
(a) If the finding of the Court or jury, as the case may be, be against the defendant alleged to be the putative father, the Court shall pass an order declaring the defendant to be the father of said child and providing for the support and maintenance of the child. Such order shall specify the sum to be paid by the defendant weekly or otherwise until the child reaches the age of 21 years, dies, marries, or becomes self-supporting, which event first occurs; provided, that in any case where said child, having reached 21 years of age, is destitute of means and unable to support himself by reason of mental or physical infirmity, the Court shall have power to require payments to be made or continued during the continuance of such mental or

18

physical infirmity. In addition to providing for the support and maintenance of the child, the order also may require the defendant to pay all or any part of the mother's medical and hospital expense for her pregnancy, confinement, and recovery, and for the funeral expenses if the child has died or dies; and in addition thereto, may award counsel fees to the attorney representing the complainant or petitioner. . . .

1963 Maryland Laws, Chapter 722. Section 66H(b) included other provisions to benefit

the emotional well-being of the child:

> 66H
> (b) The Court may include in the order any other provision, directed against any party to the proceeding, pertaining to the custody and guardianship of the child, visitation privileges with the child, the furnishing of bond, remaining in the State of Maryland, reporting changes of address, or any other matter which may be for the general welfare and best interests of the child, to the same extent and as fully as if the child were a legitimate child, all in accordance with the inherent jurisdiction of courts of equity over minors and the jurisdiction and power conferred by Section 66 of this Article and any provision of this subtitle.

1963 Maryland Laws, Chapter 722.

The declaration of paternity could not be entered without due process. The order

was a final order and subject only to the revisory power of the Court as provided by

"statute, rule of court, or the established principals of practice and procedure in equity":

> 66H
> (e) No order shall be entered against any person under this subtitle unless the person is or shall have been made a party to the proceedings and after reasonable notice to such party and an opportunity to be heard.
> *   *   *
> (g) A declaration of paternity contained in any order is final and not subject to the revisory power of the Court except in the manner and to the extent that any other order or decree of a court of equity in this State may be subject to the revisory power of the Court by virtue of any statute, rule of court, or the established principals of practice and procedure in equity. All other orders or parts of orders in the proceedings are subject to the further order of the Court, and the Court, from time to time thereafter, may annul, vary or modify the orders as to the Court may seem just and proper in the

light of the then existing circumstances and in the best interests of the child or children involved therein and also in accordance with the power of modification as provided in Section 66 of this Article.

1963 Maryland Laws, Chapter 722.

Section 66L recognized the efficacy of a settlement entered into by the alleged father of a child either before or after the filing of a petition to establish paternity. The settlement would incorporate terms for the child's support and maintenance, which, after approval by the court, were to be incorporated in an order. Significantly, the alleged father did not have to admit paternity to enter into the agreement:

> 66L
> Either before or after the filing of a bill or petition to establish paternity and to charge the putative father of an illegitimate child or children with his or their support and maintenance, the person alleged to be the father of the child or children, whether he admits or denies paternity, may propose to make a settlement with respect to his or their support and maintenance, either in a lump sum, installments, or otherwise. If the complainant or petitioner agrees to accept the settlement and the State's Attorney is satisfied that the amount and terms of the settlement are fair and reasonable and that the complainant or petitioner has been properly advised in the premises and is competent to accept the settlement, an agreement shall be prepared and duly executed and submitted to the Court for approval. In the event the Court approves the agreement, the terms thereof shall be incorporated in an order to be passed by the Court, which order shall be enforceable in all respects and to the same extent as any other order passed after a hearing.

1963 Maryland Laws, Chapter 722.

All of the cited provisions were enacted, among others, and ultimately included in the codification of Article 16 of the Annotated Code of Maryland and entitled "Paternity Proceedings." Eventually, as part of the ongoing code revision process, in 1984, the

provisions of Article 16 were recodified, without substantive change, as Sections 5-1001 *et seq.* of the Family Law Article. *See* 1984 Maryland Laws, Chapter 296. Section 66H, specifically, was divided and recodified as Sections 5-1035, 5-1037 and 5-1038 of the Family Law Article. Section 66L became Section 5-1016 of the Family Law Article.

Section 5-1038 was amended in 1995[9] to permit a court to set aside or modify a declaration of paternity "in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court" or "if a blood or genetic test done in accordance with § 5-1029" established the definite exclusion of the man named as the father in the order. The amendment also included the provision that "a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father."

In *Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000), we had occasion to determine that the 1995 amendment should be applied retroactively. We also concluded in *Langston* that a putative father seeking a revision of a paternity order under Section 5-1038 could only do so were he afforded blood or genetic testing.

*Langston* had involved three paternity cases involving two fathers, Tyrone W. and William Carl Langston. Tyrone W. had entered into a paternity agreement with Danielle R. in which he acknowledged that he was the father of T.R., while Mr. Langston had

_____

[9] The Legislature had amended Section 5-1038 in reaction to this Court's decision in *Tandra S. v. Tyrone W.*, 336 Md. 303, 648 A.2d 439 (1994), a case in which we held that a father could not challenge an enrolled paternity judgment except upon a showing of fraud, mistake, or irregularity, even if a post-judgment blood test excluded him as the father or if the mother committed perjury in the original action.

entered into separate consent decrees of paternity for two children of two different mothers, although paternity had not been established by blood or genetic testing. The three paternity agreements led to the entry of three declarations of paternity in the circuit court, which subsequently led to the entry of orders of child support against Tyrone W. and Mr. Langston. Subsequently, Tyrone filed a Complaint to Set Aside Declaration of Paternity, pursuant to Section 5-1038(a)(2)(i)2 of the Family Law Article, alleging that he was not the father of T.R.

In one of the two paternity cases involving Langston, the Circuit Court for Harford County ordered a blood test upon the request of the Harford County Department of Social Services, which was unaware that a declaration of paternity had been entered previously in the Circuit Court for Baltimore City. When the results of the blood test excluded Mr. Langston as the biological father, he filed a complaint to set aside the paternity declaration based on Section 5-1038(a)(2)(i)2 of the Family Law Article. In the second case, ultimately consolidated with the first, a show cause order had been issued to Mr. Langston for failure to pay child support.

*Langston v. Riffe*, then, presented us with the issue of whether declarations of paternity, based on a paternity agreement, as well as two consent decrees, could be set aside.[10] It was our decision in *Langston* to set aside the paternity declarations but, most

---

[10] The dissent relies on *Walter v. Gunter*, 367 Md. 386, 399 n.2, 788 A.2d 609 (2002), for its statement, drafted by the author of this opinion, that "Our Legislature never stated that the 'decent support of children' should be imposed upon those who are found, conclusively, not to be the child's parent. . . ." *Walter*, however, was a case in which a man, who had eventually consented to a judgment of paternity in a contested case, was

(continued . . . )

22

especially our determination that "a blood or genetic test is to be triggered automatically when any party, including the putative father, moves to have testing conducted", *Langston*, 359 Md. at 425, 754 A.2d at 404, upon which Mr. Davis relies to pursue a paternity test.

Mr. Davis's reliance on *Langston*, however, is misplaced, because the statute governing affidavits of parentage, Section 5-1028, has a significantly different narrative rooted in federal mandates than the governing statute in *Langston*, Section 5-1038. The origins of Section 5-1028 can be found in the federal Omnibus Budget Reconciliation Act of 1993, which mandated that every state, in order to continue to receive federal funds, establish a method by which unmarried fathers could voluntarily acknowledge paternity "during the period immediately before or after the birth of a child." Pub. L. No. 103-66, §13721, 107 Stat. 659 (1993), codified at 42 U.S.C. 666(a)(5).[11] Congress had

---

( . . . continued)
able to secure a genetic test under Section 5-1038, the dictates of which are distinguishable, as shown herein.

[11] The Omnibus Budget Reconciliation Act of 1993 amended 42 U.S.C. 666(a) to provide, in pertinent part:

> (C) Procedures for a simple civil process for voluntarily acknowledging paternity under which the State must provide that the rights and responsibilities of acknowledging paternity are explained and ensure that due process safeguards are afforded. Such procedures must include a hospital-based program for the voluntary acknowledgment of paternity during the period immediately before or after the birth of a child.
> (D) Procedures under which the voluntary acknowledgment of paternity creates a rebuttable, or at the option of the State, conclusive presumption of paternity, and under which such voluntary acknowledgment is admissible as evidence of paternity.

(continued . . . )

23

"previously tried to make evasion of paternity more difficult for non-custodial fathers", and the voluntary paternity acknowledgment programs mandated by the Omnibus Budget Reconciliation Act were initiated to take advantage of the "magic moment" immediately after birth when "many unmarried fathers visit their children in the hospital. . . ."[12] Pamela C. Ovwigho, Catherine E. Born, & Shafali Srivastava, *Maryland's Paternity Acknowledgment Program: Participant Entries into the Public Child Support and Welfare Systems*, Family Welfare Research and Training Group, 6-7 (October 2002), http://www.familywelfare.umaryland.edu/reports/ihoptanf.pdf [https://perma.cc/363W-8YUC].[13] The theory behind encouraging affidavits executed in the "magic moment" was

---

( . . . continued)

> (E) Procedures under which the voluntary acknowledgment of paternity must be recognized as a basis for seeking a support order without requiring any further proceedings to establish paternity.

[12] In the present case, the mother of the twins testified during the first hearing that the Affidavits were signed while she and the children were still in the hospital:

> [ATTORNEY FOR BUREAU]: Were the both of you – was the child still in the hospital – or children still in the hospital when those documents were signed?
> [MOTHER]: Yes.

[13] The Report, *Maryland's Paternity Acknowledgment Program: Participant Entries into the Public Child Support and Welfare Systems*, was generated "to provide empirical data to assist in program review and enhancement" and included data from 16,473 children born out of wedlock in Maryland in 2000 for whom an in-hospital paternity acknowledgment was filed. Pamela C. Ovwigho, Catherine E. Born, & Shafali Srivastava, *Maryland's Paternity Acknowledgment Program: Participant Entries into the Public Child Support and Welfare Systems*, Family Welfare Research and Training Group, 6-7 (October 2002), http://www.familywelfare.umaryland.edu/reports/ihoptanf.pdf [https://perma.cc/363W-8YUC].

that "unwed fathers are typically more willing to acknowledge paternity shortly after the child's birth, but that their willingness to do so usually subsides as the child grows older." *Id.* at 7. Not only were financial costs of concern, however, but it was more likely that an earlier paternity acknowledgment would result in the child having "access to more emotional/psychological, social entitlement and financial resources than their peers without legal fathers." *Id.* at 6. Initially, the Omnibus Budget Reconciliation Act, significantly, provided that a voluntary acknowledgment of paternity created a rebuttable presumption of paternity or, at the state's option, a conclusive presumption of paternity. Pub. L. No. 103-66, §13721, 107 Stat. 659 (1993).

In the same year, the Maryland General Assembly enacted Chapter 197 of the Maryland Laws of 1993, which originated as House Bill 459 ("H.B. 459") and Senate Bill 350 ("S.B. 350"), and later became codified as Section 5-1028 of the Family Law Article. Chapter 197 provided:

> (a) An unmarried father and mother shall be provided an opportunity to execute an affidavit of parentage in the manner provided under § 4-208 of the Health-General Article.
>
> (b) The affidavit shall be completed on a standardized form developed by the department.
>
> (c) The completed affidavit of parentage form shall contain:
> (1) in ten point bold face type a statement that the affidavit is a legal document and constitutes rebuttable presumption of parentage in a paternity proceeding;
> (2) the full name and the place and date of birth of the child;
> (3) the full name of the attesting father of the child;
> (4) the full name of the attesting mother of the child;

(5) the signatures of the father and the mother of the child attesting, under penalty of perjury, that the information provided on the affidavit is true and correct;

(6) a statement by the mother consenting to the assertion of paternity and acknowledging that her cosignatory is the only possible father;

(7) a statement by the father that he is the natural father of the child[]

(8) the social security numbers provided by each of the parents.

(d) An executed affidavit of parentage constitutes a rebuttable presumption of parentage in a paternity proceeding.

(e) The Administration shall prepare written information to be furnished to unmarried mothers under § 4-208 of the Health – General Article concerning the benefits of having the paternity of their children established, including the availability of child support enforcement services.

(f) The Department shall make the standardized affidavit forms available to all hospitals in the state.

(g) The Secretary, in consultation with the Department of Health and Mental Hygiene and the Maryland Hospital Association, shall adopt regulations governing the provisions of this section and § 4-208 of the Health – General Article.

The purpose of the enactment of Chapter 197 was to take advantage of federal funding through the federal Omnibus Budget Reconciliation Act of 1993 and to "accelerate the collection of child support payments by three months." *See* Revised Fiscal Note, Department of Fiscal Services, Bill File S.B. 350. Its supporters also posited that, "[e]stablishing paternity at birth will eliminate the need for court ordered paternity establishment, thus releasing the court from the costly and time consuming responsibility of hearing these cases." Testimony of Meg Sollenberger of the Department of Human Resources, House Judiciary Committee.

Importantly, when Chapter 197 was enacted, a "rebuttable presumption of paternity" arose after the father completed the affidavit, in which he attested to his parentage. The rebuttable presumption, according to supporters of the bills, "could be set aside should blood or DNA test or other evidence show paternity is unlikely." Letter to House Judiciary Committee, Bill File, S.B. 350. Chapter 197 was subsequently codified as Section 5-1028 of the Family Law Article.

Section 5-1028 importantly, however, was amended in 1997 to remove the rebuttable presumption of paternity and to replace that presumption with a more restricted ability to challenge the acknowledgment, temporally, 60 days, and thereafter, only upon proof of fraud, duress, or material mistake of fact. The amendment was enacted to adhere to federal mandates under the federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996.[14] The Personal Responsibility and Work Opportunity

---

[14] The dissent asserts, without citation to authority, that the legislative history of Section 5-1028 does not support it having been amended to comport with federal mandates that required the omission of a rebuttable presumption when they did. Rather, the dissent, to support its proposition, relies upon a version of the Uniform Parentage Act, which was proposed in 2000, <u>after</u> Section 5-1028 was amended to remove the rebuttable presumption. Therefore, the 2000 version of that Act has no bearing on the legislative history of Section 5-1028.

Even if the 2000 version of the Uniform Parentage Act were to have applied, the provisions contained in the Uniform Parentage Act relevant to the establishment of paternity by affidavit provide that: "Except as otherwise provided in Section 307 and 308, a valid acknowledgment of paternity filed with the [agency maintaining birth records] is equivalent to an adjudication of paternity of a child and confers upon the acknowledged father all of the rights and duties of a parent", *see* § 305(a). The rescission provisions for a paternity affidavit in the Uniform Parentage Act mirror Maryland's provisions in that they provide for rescission of:

>     an acknowledgment of paternity . . . by commencing a
>     proceeding to rescind before the earlier of (a) 60 days after

(continued . . . )

Reconciliation Act of 1996 replaced the federal Aid to Families with Dependent Children program with a program of block grants to states for Temporary Assistance for Needy Families ("TANF"). A state's participation in the Program is voluntary, although when a State chooses to participate it must comply with the Social Security Act's Title IV-D's provisions regarding child support enforcement, which requires states to establish procedures for a voluntary paternity acknowledgment that, when executed, is a "legal finding of paternity":

> (C) VOLUNTARY PATERNITY ACKNOWLEDGMENT.—
>
> (i) Simple Civil Process
> Procedures for a simple civil process for voluntarily acknowledging paternity under which the State must provide that, before a mother and a putative father can sign an acknowledgment of paternity, the mother and the putative father must be given notice, orally and in writing, of the alternatives to, the legal consequences of, and the rights (including, if one parent is a minor, any rights afforded due to minority status) and responsibilities that arise from, signing the acknowledgment.
> *     *     *
> (D)(ii) Legal Finding of Paternity
> Procedures under which a signed voluntary acknowledgment of paternity is considered a legal finding of paternity, subject to the right of any signatory to rescind the acknowledgment within the earlier of --

---

( . . . continued)

> the effective date of the acknowledgment []; or (2) the date of the first hearing, in a proceeding to which the signatory is a party, before a court to adjudicate an issue relating to the child, including a proceeding that establishes support.

*See* § 307. The only distinction is a two year rescission provision as adverse to a 60 day time period. *See* § 308. The adjudication provision relied on by the dissent, thus, only comes into play where a father who had signed an affidavit attempted to rescind during the applicable time period of two years from the execution of the affidavit, or under circumstances of fraud, duress or material mistake of fact. The Uniform Parentage Act, thus, embodies the same conclusive presumption in the absence of a timely challenge or one based on fraud, duress or material mistake of fact.

28

(I) 60 days; or

(II) the date of an administrative or judicial proceeding relating to the child (including a proceeding to establish a support order) in which the signatory is a party.

(iii) Contest

Procedures under which, after the 60-day period referred to in clause (ii), a signed voluntary acknowledgment of paternity may be challenged in court only on the basis of fraud, duress, or material mistake of fact, with the burden of proof upon the challenger, and under which the legal responsibility (including child support obligations) of any signatory arising from the acknowledgment may not be suspended during the challenge, except for good cause shown.

42 U.S.C. 666 (1996).

In Maryland, House Bill 1074 and Senate Bill 636 were introduced in 1997 in order to comply with the federal mandate. The Floor Report associated with Senate Bill 636 recognized that the "legal finding of paternity" standard replaced the earlier rebuttable presumption language:

Senate Bill 636 makes a number of changes in State law that are designed to bring Maryland into compliance with new federal child support enforcement requirements. These changes include the following: . . . [e]stablishing that an affidavit of parentage constitutes a legal finding of paternity, rather than a rebuttable presumption; [a]llowing a legal finding of paternity established by affidavit to be set aside only if it is rescinded within a specific time period and the party challenging it proves that the affidavit was executed because of fraud, duress, or a material mistake of fact . . .

Enactment of Chapter 609 of the Laws of Maryland of 1997 as codified resulted in the version of Section 5-1028, which at the time Mr. Davis executed his affidavit (and now), provided:

(a) An unmarried father and mother shall be provided an opportunity to execute an affidavit of parentage in the manner provided under § 4-208 of the Health - General Article.

(b) The affidavit shall be completed on a standardized form developed by the Department.

(c)(1) The completed affidavit of parentage form shall contain:
  (i) in ten point boldface type a statement that the affidavit is a legal document and constitutes a legal finding of paternity;
  (ii) the full name and the place and date of birth of the child;
  (iii) the full name of the attesting father of the child;
  (iv) the full name of the attesting mother of the child;
  (v) the signatures of the father and the mother of the child attesting, under penalty of perjury, that the information provided on the affidavit is true and correct;
  (vi) a statement by the mother consenting to the assertion of paternity and acknowledging that her cosignatory is the only possible father;
  (vii) the Social Security numbers provided by each of the parents.

  (2) Before completing an affidavit of parentage form, the unmarried mother and the father shall be advised orally and in writing of the legal consequences of executing the affidavit and of the benefit of seeking legal counsel.

(d)(1) An executed affidavit of parentage constitutes a legal finding of paternity, subject to the right of any signatory to rescind the affidavit:
  (i) in writing within 60 days after execution of the affidavit; or
  (ii) in a judicial proceeding relating to the child:
      1. in which the signatory is a party; and
      2. that occurs before the expiration of the 60-day period.
  (2)(i) After the expiration of the 60-day period, an executed affidavit of parentage may be challenged in court only on the basis of fraud, duress, or material mistake of fact.
  (ii) The burden of proof shall be on the challenger to show fraud, duress, or material mistake of fact.
  (iii) The legal responsibilities of any signatory arising from the affidavit, including child support obligations, may not be suspended during the challenge, except for good cause shown.

(e) The Administration shall prepare written information to be furnished to unmarried mothers under § 4-208 of the Health – General Article concerning the benefits of having the paternity of their children established, including the availability of child support enforcement services.

(f) The Department shall make the standardized affidavit forms available to all hospitals in the State.

(g) The Secretary, in consultation with the Department of Health and Mental Hygiene and the Maryland Hospital Association, shall adopt regulations governing the provisions of this section and § 4-208 of the Health – General Article.

1997 Maryland Laws, Chapter 609.

The legislative history of both Sections 5-1038 and 5-1028, thus, reflects that Section 5-1038 was amended in 1995 to weaken the finality of a paternity declaration even after a putative father had executed a paternity agreement, which did not require him to admit to paternity. The General Assembly, however, amended Section 5-1028 in 1997 to eviscerate the rebuttable presumption and replace it with the more constricting "legal finding of paternity" after the father executes an affidavit of parentage, thereby *strengthening the finality* of the affidavit of parentage. The basis of the latter was to comport with federal funding mandates, and most importantly, to limit the ability of a father who voluntarily acknowledged his paternity to thereafter, possibly years later, as in the instant case, obtain post-judgment blood or genetic testing.[15]

---

[15] The dissent argues that a piece of the testimony of Mr. Clifford Layman, the then Executive Director of the Maryland Child Support Enforcement Administration, relative to the amendment to Section 5-1028 enacted in 1997 supports the notion that anyone who executes an Affidavit of Parentage is thereafter entitled to a genetic test; that conclusion is unwarranted. The testimony of Mr. Layman, a miniscule portion of the sixteen pages of which is in the dissent, supports that the rebuttable presumption of paternity was being

(continued . . . )

The limitations of a father's ability to challenge an affidavit of paternity only on the grounds of fraud, duress, or material mistake of fact was recognized by the Court of Special Appeals in *Burden v. Burden*, 179 Md. App. 348, 945 A.2d 656 (2008). Our intermediate appellate court held that the father could not disestablish paternity when his signing of the Affidavit did not involve fraud, duress, or material mistake of fact. *Id.* at 369, 945 A.2d at 669. Our conclusion also comports with the decision of the Supreme Court of Illinois in *People ex rel. Dept. of Public Aid v. Smith*, 818 N.E.2d 1204 (Ill. 2004), when that court, interpreting the same language as our Section 5-1028, ruled out a challenge when a father, who had executed an affidavit of paternity, actually found out that he was not the father; the court was emphatic that "a man who voluntarily acknowledges paternity can later challenge the *voluntariness* of the acknowledgment if he can show that it was procured by fraud, duress, or material mistake of fact, but the

eviscerated from the Maryland statute in order to comply with federal mandates. Mr. Layman points out that <u>contested</u> proceedings encompass genetic testing, "[u]nder the Act State IV-D agencies must be able (without further order from any other judicial or administrative tribunal) to: [o]rder genetic tests in contested patterning proceedings." *Child Support Enforcement Procedures: Hearing on S.B. 636 Before the S. Comm. On Judicial Proceedings*, 1997 Leg. Sess. 5 (statement of Clifford Layman, Executive Director, Maryland Child Support Enforcement Administration). He recognized, however, the <u>conclusive</u> presumption that would attach to an Affidavit of Parentage executed in the hospital, such as in the present case, under proposed Section 5-1028:

> A signed paternity affidavit becomes a legal finding within 60 days unless challenged for fraud, duress, or mistake of fact. The success of Maryland's in-hospital paternity affidavit program demonstrates that unwed parents will volunteer to legally protect their children by establishment paternity. Under this new provision, parents will be able to establish conclusive paternity for children born out of wedlock administratively without the costs and delays associated with the judicial process.

*Id.* at 12-13.

Parentage Act does not allow him to challenge the conclusive presumption of paternity with contrary evidence." *Id.* at 1213 (emphasis in original).

To conflate Sections 5-1038 and 5-1028, as Mr. Davis would have us do, violates the essence of Section 5-1028. It is clear that Sections 5-1028 and 5-1038 are not coterminous and that there are limited opportunities to challenge an Affidavit of Parentage under Section 5-1028, which Mr. Davis took but lost. Mr. Davis now is not entitled to a blood or genetic test to contest the parentage he established after execution of his Affidavit of Parentage.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

Circuit Court for Wicomico County
Case No.: 22-C-11-001097
Argued: January 8, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 46

September Term, 2015

JUSTIN DAVIS

v.

WICOMICO COUNTY BUREAU

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Rodowsky, Lawrence F.,
   (Retired, Specially Assigned)

JJ.

Concurring Opinion by Adkins, J.

Filed: April 25, 2016

* Battaglia, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of the majority opinion.

Respectfully, I concur with the Majority. I would be joining the Dissent, in its analysis on the merits of how to interpret the relevant statutes, were this case an appeal from the 2011 judgment that Davis was not entitled to genetic testing. At that point, I would have reversed on grounds that he was so entitled. My decision would rest on the careful and thoughtful interpretation of the legislation that is delineated in the Dissent. This would surely be the equitable result.

But the doctrine of *res judicata* is fundamental to our jurisprudence, and I do not agree with the Dissent's analysis regarding the *res judicata* effect of the 2011 judgment. As both the Majority and the Court of Special Appeals say, the 2011 judgment of the Circuit Court denied Davis's request for genetic testing to determine parentage. In the 2011 litigation, Davis repeatedly told the judge that he sought genetic testing, but the judge denied his request on grounds of his Affidavit of Parentage. Without a doubt, the question of whether he was entitled to a paternity test is a matter that was decided in the 2011 case. It was sufficient for the judge to state that he was making his ruling against Davis based on the Affidavit of Parentage and the absence of fraud at the time Davis made the Affidavit, without specifically stating that in doing so, he effectively denied the requests for a paternity test. If Davis disagreed with that ruling, he should have appealed the 2011 final judgment. That judgment bars any re-litigation of the issue of Davis's paternity. *See Calandrea v. Wilde Lake Community Ass'n, Inc.*, 361 Md. 371, 392 (2000).

With regret that we cannot afford equitable relief in violation of the firmly settled doctrine of *res judicata*, I join the judgment of the Majority.

Circuit Court for Wicomico County
Case No. 22-C11-1097
Argued: January 8, 2016

IN THE COURT OF APPEALS
OF MARYLAND

No. 46

September Term, 2015

JUSTIN DAVIS

v.

WICOMICO COUNTY BUREAU

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Rodowsky, Lawrence F.
(Retired, Specially
Assigned),

JJ.

Dissenting Opinion by McDonald, J.,
which Barbera, C.J., and Watts, J., join

Filed: April 25, 2016

*Battaglia, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of the majority opinion.

Petitioner Justin Davis seeks a genetic test under Maryland Code, Family Law Article,[1] §§5-1029 and 5-1038, in order to determine whether he is the father of twins born to Jessica Cook in 2009. According to Mr. Davis, Ms. Cook led him to believe, at the time of the birth, that he was the biological father and he executed affidavits of parentage to that effect. It is undisputed that Ms. Cook herself never believed that they were Mr. Davis' offspring.

The Majority opinion holds that Mr. Davis cannot get a genetic test because he is precluded by his unsuccessful attempt to avoid a finding of paternity in 2011, which was predicated on his execution of the affidavits of parentage (rather than anything to do with a paternity test). Even though the Majority opinion disposes of the case on that ground, it goes on and suggests that no one who has signed an affidavit of parentage (even if incorrectly led to believe he was the biological father of the child) can ever get a genetic test to determine paternity. I disagree with both of these conclusions. To explain that disagreement, it is helpful to elaborate in somewhat greater detail the context, both factual and legal, of this case.

**Background**

*Facts*

Because this case was decided against Mr. Davis on summary judgment, we must view the facts in the light most favorable to Mr. Davis. *Serio v. Baltimore County,* 384 Md. 373, 388, 863 A.2d 952 (2004).

---

[1] All subsequent statutory citations are to the Family Law Article unless otherwise noted.

Mr. Davis and Ms. Cook began a romantic relationship around December 2008. They broke up for a short time in 2009 − Mr. Davis testified that it was three weeks − and then got back together around May 2009. When they got back together, Ms. Cook informed Mr. Davis that she was pregnant. According to Ms. Cook's testimony, she was two months pregnant at that time, which is consistent with the fact that the children, who were twins, were born seven months later in December 2009.

At an evidentiary hearing in the Circuit Court, Ms. Cook testified about her conversations with Mr. Davis about her pregnancy. According to Ms. Cook, she told Mr. Davis that there was a possibility that he was not the children's biological father. Later in her testimony, however, she explained that she had not explicitly told him that, but rather had simply assumed that he understood that another man was her children's biological father. Speaking over some interruptions, in response to questions from Mr. Davis (who was appearing *pro se)*, she testified: "If you wanted a relationship ... I had to tell you that I was pregnant. You didn't ask me whether it was yours or not at that time. I just assume[d] that you knew that since we weren't together and we hadn't been together, and I was pregnant that it wouldn't have been yours." For his part, Mr. Davis testified that he believed that the children were his at the time that he and Ms. Cook resumed their relationship. At the summary judgment stage, we must resolve this in favor of Mr. Davis: he did not know that the children were not his, although apparently Ms. Cook did.

2

(According to Ms. Cook's testimony, the father of her children is a man who now resides in Sweden.[2]).

Mr. Davis and Ms. Cook moved in together shortly before the birth of the children. On December 23, 2009, shortly after the twins were born, Mr. Davis and Ms. Cook were presented at the hospital with an affidavit of parentage for each baby. They signed both affidavits. Above Ms. Cook's signature, each affidavit read, in part, "I consent to the admission of paternity and acknowledge that the man named above is the only possible father of my child."[3] Above Mr. Davis' signature, each affidavit read, in part, "I acknowledge that I am the natural father of the child named above."

Sometime later, the babies' physician pointed out to Mr. Davis the disparity in appearance between him and the children. In Mr. Davis' words, the children are "visibly, visibly Caucasian" and Mr. Davis is not. Mr. Davis became concerned that the children were not actually his, and confronted Ms. Cook. As a result, Mr. Davis concluded that the children were not his, and their relationship ended. As noted above, Ms. Cook later confirmed, both in testimony and in filings under oath, that Mr. Davis is not the biological father of the two boys.

---

[2] The Circuit Court took judicial notice of statements by Ms. Cook in other cases in the Circuit Court concerning name change petitions in which she stated, under penalties of perjury, that Mr. Davis was not the father of the two boys.

[3] Ms. Cook explained the discrepancy between this statement in the affidavits of parentage – that Mr. Davis was "the only possible father" of the children – and her testimony at trial and elsewhere – that he was not their father − on the basis that she had executed those forms at a time when she was "on a lot of drugs" having just endured both a natural birth of the first twin and a Caesarean delivery of the second twin.

*Procedural History*

On July 25, 2011, the Wicomico County Bureau of Support Enforcement filed a Complaint for Child Support against Mr. Davis in the Circuit Court for Wicomico County.[4] The Bureau rested its case entirely on the two affidavits of parentage executed by Mr. Davis at the time of the birth. Mr. Davis responded in writing and denied paternity. On September 16, 2011, the case went to trial in the Circuit Court. Mr. Davis, who was *pro se* in this trial,[5] denied that he was the father of the children and repeatedly asked for a genetic test to show that the children were not his.

In introducing the case to the court at the outset of the trial, counsel for the Bureau submitted the affidavits of parentage and advised the court that Mr. Davis was challenging the validity of the affidavits – *i.e.*, making a claim under §5-1028 relating to affidavits of parentage. During the trial the Bureau's counsel never addressed, in either argument or evidence, Mr. Davis' request for a genetic test. The court apparently accepted the framing of the issues presented by the Bureau's counsel and did not address

---

[4] In general, either the State's Child Support Enforcement Administration, which is part of the Maryland Department of Human Resources, or a local support enforcement office has responsibility for support enforcement when the obligor must make support payments to a public agency as the payee or as a collection agent for the payee. *See* §§10-106, 10-108(b).

[5] Mr. Davis' father, who is licensed to practice law in Pennsylvania, came to court to represent Mr. Davis, but he was unable to do so because he is not licensed in Maryland.

4

Mr. Davis' request for a genetic test, much less decide the merits of that request.[6]  After

testimony from Mr. Davis and Ms. Cook, the Circuit Court found that Mr. Davis had not

met the statutory standard to rescind the affidavits of parentage.  As a result, the Circuit

Court held that Mr. Davis was the father of Ms. Cook's children and ordered Mr. Davis

to pay child support.[7]  Mr. Davis did not appeal that decision.

On September 10, 2013, now with the assistance of counsel, Mr. Davis filed a

complaint in the Circuit Court for Wicomico County asking that the court order a genetic

test as authorized by statute (§5-1029) and, assuming that the test confirmed that he was

*not* the father, that the declaration of paternity and the child support order be set aside, as

also provided by statute (§5-1038).  After dealing with several motions not relevant here,

the Circuit Court held a hearing on December 13, 2013, at which it received documentary

evidence, took judicial notice of court records, and heard legal argument.  The Circuit

Court subsequently granted summary judgment against Mr. Davis on December 20, 2013.

The court held that Mr. Davis was not entitled to a genetic test because:  (1) Mr. Davis

was attempting to challenge the affidavits of parentage, but a genetic test is not one of the

ways to challenge an affidavit of parentage; (2) Mr. Davis was precluded from

---

[6] According to the Circuit Court, the only issue before it was whether the affidavits should be rescinded.  The court concluded that the answer was "no" and held that the children "are [Mr. Davis'] children by law, and that's the end of the story."  In "ending the story" at that point – *i.e.*, whether the affidavits should be rescinded – it never addressed the merits of whether Mr. Davis was entitled to a genetic test.

[7] After making its ruling, the Circuit Court judge speculated that Mr. Davis might in fact be the biological father of the children, based on a television show the judge had seen.

challenging the two affidavits due to the 2011 proceedings; and (3) Mr. Davis was precluded from pursuing his claim for a genetic test due to the 2011 proceedings.

Mr. Davis appealed to the Court of Special Appeals, which affirmed in a reported decision. 222 Md. App. 230, 112 A.3d 1024 (2015).

## Discussion

### A. *Standard of Review*

At issue before us is the Circuit Court's award of summary judgment denying Mr. Davis' request for a genetic test pursuant to statute. An award of summary judgment necessarily depends on the resolution of a legal issue. Accordingly, it is reviewed without deference to the lower court. *Serio*, 384 Md. at 388.

The Majority opinion correctly notes that we issued a writ of *certiorari* in this case to analyze the relationship between an affidavit of parentage and a request for a genetic test. Majority slip op. at 8. Accordingly, I will discuss that issue first. Then I will explain why I believe the Majority opinion's decision to reject Mr. Davis' claim on the basis of res judicata either misunderstands or misapplies the principles of claim preclusion.

### B. *Whether an Affidavit of Parentage Precludes a Genetic Test*

*Statutory Structure*

This case involves construction of the statutes concerning genetic tests to prove or disprove paternity – and the relationship of those statutes to the statute providing for affidavits of parentage. As always, statutes must be construed in context. *Lockshin v. Semsker*, 412 Md. 257, 276, 987 A.2d 18 (2010) ("the plain language must be viewed

6

within the context of the statutory scheme to which it belongs"). Accordingly, one must consider the statutory scheme in which these provisions appear.

The provision that pertains to the affidavit of parentage is located in Family Law Article, Title 5 (Children), Subtitle 10 (Paternity Proceedings), Part V (Hearing on Complaint).[8] Part V describes the procedure for determining paternity when it is contested. It begins with §5-1024, which describes the consequences of a defendant's failure to appear. Next, §5-1025 requires that the trial be held after the birth of the child, and describes the procedure to follow when a complaint is filed before the birth of the child. The next two sections, §§5-1026 and 5-1027, set some parameters for trial of the matter: no jury is required, ordinary civil rules apply, comment on a defendant's failure to testify is prohibited, the burden of proof is on the complainant, there is a rebuttable presumption that a man to whom the mother is married at the time of conception is the father, and a defendant may not be compelled to testify.

Section 5-1028 concerning an affidavit of parentage also appears in Part V (Hearing on Complaint). It provides that "[a]n executed affidavit of parentage constitutes a legal finding of paternity," subject to rescission by any signatory within 60 days. §5-1028(d)(1). After 60 days, the affidavit of parentage may be challenged only on the grounds of "fraud, duress, or material mistake of fact." §5-1028(d)(2)(i).

---

[8] The designations of these various Parts of Subtitle 10 of Title 5 of the Family Law Article were part of statute as enacted by the General Assembly when it created the Family Law Article, *see* Chapter 296, Laws of Maryland 1984, and not simply a caption or catch line added by a legal publisher, *see* Maryland Code, General Provisions Article, §1-208.

7

The main provision for genetic tests also appears in Part V: "On the motion of the [Child Support Enforcement Administration of the Maryland Department of Human Resources], a party to the proceeding, or on its own motion, the court *shall order* the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child." §5-1029(b) (emphasis added). This language is mandatory: when a proper person or entity makes a proper motion, the court *must* order the test.

The next part of the statutory scheme − Part VI (Court Order) − describes the judicial order that follows from the proceedings in Part V. First, "[i]f the court finds that the alleged father is the father, the court shall pass an order that: (1) declares the alleged father to be the father of the child; and (2) provides for the support of the child." §5-1032. Subsequent provisions detail how the court shall determine who owes what to whom. *See* §5-1033 (child support and other expenses); §5-1036 (court costs); §5-1034 (who receives payment). Other items that may be contained in the order are also detailed, and a provision describes the result of finding for the alleged father. *See* §5-1035 (miscellaneous provisions in order); §5-1039 (finding for alleged father).

It is in Part VI that a key provision, §5-1038, appears. It provides that a declaration of paternity is final except, as pertinent here, "if a blood or genetic test done in accordance with §5-1029 ... establishes the exclusion of the individual named as the father in the order." §5-1038(a)(2)(i)(2). It is notable that such a challenge to a declaration of paternity is subject to an exception: "a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity

8

knowing he was not the father." §5-1038(a)(2)(ii). This suggests that an individual who acknowledges paternity – *e.g.*, by executing an affidavit of parentage − *without knowledge* that he is not the father may overturn a finding of paternity with the results of a genetic test.

*The Roles of the Affidavit of Parentage and the Genetic Test*

In the context of this statutory structure, the role of an affidavit of parentage becomes clear. The provision describing an affidavit of parentage as constituting a "legal finding of paternity," §5-1028, appears in Part V, which describes the hearing on the complaint and procedures for proving or disproving paternity. This placement indicates that an affidavit of parentage serves to preempt the usual trial process: the parties can either have a full bench trial, as described in §§5-1024 through 5-1027, or a party can short-circuit that process by presenting an affidavit of parentage under §5-1028. In essence, given its location in the statutory scheme, §5-1028 appears to be an alternative procedure to establish legal paternity. Indeed, in this case, the Bureau's entire case consisted of submission of the affidavits of parentage executed by Ms. Cook and Mr. Davis.

Either way, once the hearing is complete, if the court finds that the alleged father is the father, then the court issues an order under the provisions in Part VI. This order includes a declaration of paternity under §5-1032 and anything else appropriate under that Part. That is, there are two ways to reach a declaration of paternity under §5-1032: a bench trial under the first four sections of Part V or an affidavit of parentage under §5-

9

1028, also in Part V. Both paths lead to the same destination: a declaration of paternity under §5-1032.[9]

In this context, the role of §5-1038 also becomes clear: by its terms, §5-1038 provides the grounds for modifying or setting aside a "declaration of paternity in an order"—that is, a declaration of paternity in an order under §5-1032. Because §5-1029, which is referenced in §5-1038, is located in Part V (Hearing on the Complaint), and Part V describes court procedure, it must be possible to request this test during the court proceedings. Also, because §5-1038 refers to "modif[ying] or set[ting] aside" an order, it must be possible to request this genetic test after the court issues the order, as this Court has held. *See Langston v. Riffe*, 359 Md. 396, 754 A.2d 389 (2000) (allowing a genetic test nine years after the court order).

*The Relationship Between the Affidavit of Parentage and a Genetic Test*

It may seem strange that the standard in §5-1038 for setting aside a judicial order is so different from the standard in §5-1028 for setting aside an affidavit of parentage. After all, it is possible for an alleged father to satisfy the standard in §5-1038 − he signed the affidavit of parentage believing that he was the father, but he would like a genetic test now that doubt has arisen, and the genetic test shows that he is not the father − even if he

---

[9] The affidavit of parentage also has some significance independent of a contest over paternity and a court order. Execution of such an affidavit will result, in a case of an unmarried mother, in the individual's name appearing on the child's birth certificate. *See* Maryland Code, Health-General Article, §4-208. But this is essentially no different than the fact that the name of the husband of a married mother appears on a child's birth certificate consistent with the statutory presumption. *See* §5-1027(c); Maryland Code, Estates & Trusts Article, §1-206.

cannot meet the standard in §5-1028 for rescission of the affidavit − there was no fraud, duress, or material mistake of fact. The alleged father might have honestly but mistakenly believed he was the father without legally meeting the standards of fraud, duress, or material mistake of fact. Indeed, that may be this case: the alleged father's misunderstanding may have arisen because of miscommunication, rather than intentional deception.[10]

In such a situation, the affidavit of parentage is not rescinded, but the judicial order declaring paternity and requiring child support may be set aside if the genetic test excludes the alleged father. Once the order declaring paternity is set aside, the court must enter judgment for the alleged father. The alleged father is *not* the father, because the genetic test proved that he was not.

*Legislative Purpose*

Ultimately, we are seeking to carry out the legislative purpose in construing these statutes. Legislative history can shed light on the purpose of a statute, and this Court ordinarily considers the lineage of a statute when attempting to discern that purpose. *See Rose v. Fox Pool Corp.*, 335 Md. 351, 359-60, 643 A.2d 906 (1994).

The General Assembly most recently amended §5-1028 concerning the effect of an affidavit of parentage in 1997. *See* Chapter 609, Laws of Maryland 1997. As the Majority opinion explains, prior to that amendment, an affidavit of parentage established

---

[10] While Mr. Davis' counsel has argued that Ms. Cook purposely misled Mr. Davis and committed fraud – presumably in an effort to satisfy the "fraud" criterion for rescinding an affidavit of parentage – we need not reach that conclusion to hold that he is entitled to a genetic test.

11

a *rebuttable presumption* of paternity. *See* Majority slip op. at 27. The 1997 law amended the statute so that an affidavit of parentage now creates a *legal finding* of paternity. This was in response to the federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996, a major welfare reform bill that required states, among other things, to make certain changes to their paternity establishment procedures as a condition of the receipt of funding for Temporary Assistance for Needy Families. *See* Testimony of Alvin C. Collins, Secretary of Human Resources, before the Senate Judicial Proceedings Committee concerning Senate Bill 636 (1997) (February 25, 1997). The goal of the federal law was to increase the number of children supported by both parents and thereby decrease the support required from the general public. *See* H.R. Rep. No. 104-651 at 1326 (1996), reprinted in 1996 U.S.C.C.A.N. 2183, 2383 ("In the absence of paternity establishment, taxpayers are left to pay literally billions of dollars in welfare expenses that are the obligation of delinquent parents."). Specifically, the change that an affidavit of parentage becomes a legal finding of parentage was intended to "simplify voluntary paternity establishment" by providing a formal method of acknowledgement by the father. *Id.*

The Majority opinion suggests that the federal law required states to create paternity establishment procedures that would accord greater standing to an affidavit of parentage than to a judicial declaration of paternity after trial and that would preclude a finding of paternity based on such an affidavit being overturned by the results of a genetic test. Majority slip op. at 27-32. In fact, the federal law supports neither proposition. Indeed, when the Uniform Law Commissioners revised the Uniform

12

Parentage Act to incorporate the requirements of the federal welfare reform legislation, the commissioners provided that the "paternity of a child having a presumed, *acknowledged*, or adjudicated father" could be overturned by results of genetic testing that excluded the putative father. 9B Uniform Laws Annotated, Uniform Parentage Act (2000) §631 (emphasis added); *see also id.*, Comment ("This section establishes the controlling supremacy of genetic test results in the adjudication of paternity …").[11]

The legislative history of the 1997 Maryland legislation reveals the concerns that resulted in the amendment of the statute concerning affidavits of parentage. First, the State legislation echoed the importance that the federal law placed *parental* support for children over public support. As the testimony before the Legislature indicated, the establishment of paternity in cases of unmarried mothers was not simply a matter of securing monetary support for the child. The Director of Child Support Enforcement testified:

> Not only does a legal parental link open the doors to benefits such as social security, gifts of inheritance, and medical coverage, but also to less quantifiable benefits such as the value to the child of knowing his or her father, an opportunity for extended family ties, and access to medical history and genetic information.

---

[11] The Majority opinion appears to concede that the Uniform Parentage Act (2000), like the amendments to §5-1028, was drafted to comply with the federal welfare reform legislation. Majority slip op. at 27-28 n.14. The Majority does not explain how it came to such a different understanding from the drafters of the uniform law as to how federal law contemplates that a request for a genetic test relates to a formal acknowledgement of paternity.

13

Testimony of Clifford Layman, Executive Director, before Senate Judicial Proceedings Committee concerning Senate Bill 636 (February 25, 1997) at p.11.[12]

Because the goal of the legislation was to hold parents responsible for their own children and to establish a connection between parent and child, it seems entirely contrary to the legislative intent to hold *non-parents* responsible for *other people's* children. *See Walter v. Gunter*, 367 Md. 386, 399 n.12, 788 A.2d 609 (2002) ("Our Legislature never stated that the 'decent support of children' should be imposed upon those who are found, conclusively, not to be the child's parent …"). Denying a paternity test to a person who signed an affidavit of parentage runs the risk of doing precisely the opposite of what the General Assembly intended.

Second, it is true that finality was another legislative concern. Changing the consequence of an affidavit of parentage from a rebuttable presumption of paternity to a legal finding of paternity increases the finality of an affidavit of parentage, but it does not suggest that finality always trumps accuracy. When a genetic test can easily prove (or disprove) paternity with a high degree of accuracy, the legislative history does not provide any reason to think that the General Assembly would prefer that a court avoid finding out the truth regarding a child's parentage. In urging the Legislature to pass the 1997 amendments, the Secretary of Human Resources noted the "linkage" of expedited paternity establishment procedures with genetic testing. Stating that genetic testing was a

---

[12] The Majority opinion includes other portions of Mr. Layman's testimony in a footnote. *See* Majority slip op. at 31-32 n.15. Those excerpts simply confirm the analysis of the statutory structure set forth in pp. 6-11 above and says nothing about precluding genetic testing.

14

"key element to streamlining the paternity establishment process," the Secretary concluded that paternity could be "essentially resolved" through such testing due to the high degree of accuracy. *See* Testimony of Alvin C. Collins, Secretary of Human Resources, before the Senate Judicial Proceedings Committee concerning Senate Bill 636 (1997) (February 25, 1997) at p.9.

The bottom line is evident: an affidavit of parentage is not meant to conclusively prove that which is false. Rather, an affidavit of parentage is meant to correctly establish paternity by a formal acknowledgement so that unwed fathers provide financial, emotional, and social support to their biological children. *See* Pamela C. Ovwigho, Catherine E. Born, & Shafali Srivastava, *Maryland's Paternity Acknowledgment Program: Participant Entries into the Public Child Support and Welfare Systems*, at 6, October 2002, available at https://perma.cc/363W-8YUC. Thus, when an alleged father is not the biological father of the children, using an affidavit of parentage to establish paternity incorrectly over the protest of the alleged father not only unfairly saddles an individual with responsibility for children unrelated to that individual, but also deprives the children of the connection with their biological father that the affidavit of parentage was supposed to encourage and protect. Such an interpretation seems contrary to the purpose of the statute.

Hence, as the statutory text explains and the legislative history confirms, when an alleged father signs an affidavit of parentage on the basis of a genuine but incorrect belief that he is the father of the children, and he later requests a genetic test to show whether is in fact the father of the children, he is entitled to one. Then, if the test conclusively

15

shows that he is not the father of the children, he no longer has the legal responsibilities that a father must have.

*The Plight of Mr. Davis*

In my view, the Circuit Court erred in denying Mr. Davis a genetic test. At this stage of the proceedings, we are to regard the evidence in the light most favorable to Mr. Davis – that he signed an affidavit of parentage based on an honest but mistaken belief that he was the father of Ms. Cook's children. The Circuit Court in 2011 properly recognized that the affidavit of parentage constituted a legal finding of paternity. However, when Mr. Davis requested a genetic test in 2011, the court should have granted that request. The court resolved the case − without ever saying explicitly that the request for a genetic test was denied − on the basis that Mr. Davis failed to produce anything that would allow him to rescind the affidavits of parentage after the 60-day window. However, that decision answered the wrong question (and the Majority opinion appears to make the same mistake).[13]   Mr. Davis was not asking, under the terms of §5-

---

[13] Perhaps this is because the Bureau has consistently characterized Mr. Davis' position as challenging the validity of the affidavits under §5-1028. It did so when Mr. Davis was *pro se* in the first proceeding in 2011, referring to Mr. Davis's claim as one to "challenge the validity of those Affidavits under [§5-1028]," and it has continued to do so throughout this case, including in its brief before us in which it stated that "Mr. Davis, however, seeks not to rescind a judicial paternity declaration under §5-1038, but rather to rescind the affidavits of parentage that established his legal paternity under §5-1028."

This is simply mistaken. Mr. Davis never asked to rescind the affidavits in the 2011 proceeding. He said, "I'm not asking for anything else. I'm just asking for a paternity test to actually prove paternity." Although his counsel did argue before us that there was a basis for rescinding the affidavits, his opening brief clearly continued to seek a paternity test quite independently of the validity of the affidavits – in particular, one of

(continued . . . )

16

1028(d)(2)(i), to rescind the affidavits of parentage. He was asking, under the terms of §5-1038(a)(2)(i)(2) and §5-1029(b), for a genetic test.[14] As the preceding discussion shows, those standards are entirely different; finding that Mr. Davis had not met the standard in §5-1028 has nothing to do with whether he can meet the standards in §5-1038.

In *Langston, supra,* this Court held that individuals who had previously formally acknowledged paternity in court – including in a consent decree – could later seek a genetic test pursuant to §§5-1029 and 5-1038. In my view, there is no basis in the

---

(. . . continued)
the headers of his opening brief was, "Sections 5-1029 and 5-1038(a)(2)(i)(2) of the Family Law Article and *Langston v. Riffe* Entitle Appellant to Obtain a Paternity Test."

[14] At the time that Mr. Davis made his first request, during the hearing in the 2011 case, there was not yet a declaration of paternity to modify or set aside. However, §5-1029 has no explicit time limits; a party may request a genetic test during or after the proceeding. One might conclude from the respective placements of §5-1029 and §5-1038 that a genetic test requested during the proceeding is for use during the bench trial under §§5-1024 through 5-1027 and a genetic test requested after the proceeding is to set aside an order under §5-1038, so Mr. Davis should have waited until the order issued before he requested a test. However, it seems very odd to require a litigant to sandbag a court; it seems more plausible that the General Assembly intended that one can request a genetic test that will be used under §5-1038 even before the order has been issued. Hence, Mr. Davis could make his request when he did.

As a related point, the Circuit Court in 2013 wrote that there never was an order declaring that Mr. Davis was the father of Ms. Cook's children. However, while the 2011 order never explicitly said that Mr. Davis was the father, it did say, "the Defendant [Mr. Davis] has a legal obligation to support the children identified in the Complaint for Child Support[.]" The basis of this statement was the court's prior oral ruling, "These are your children by law, and that's the end of the story." As a result, the Circuit Court's written order, based on its clear oral ruling, was sufficient to constitute a declaration of paternity under §5-1032.

statutes or their legislative history to conclude that an acknowledgement made in an affidavit of parentage executed shortly after a birth should be considered more impregnable from scientific verification than a formal acknowledgement made in court.

In particular, on these facts, the only relevant basis for denying Mr. Davis a genetic test is set forth in §5-1038(a)(2)(ii): if the court found that Mr. Davis did in fact know that the children were not biologically his when he signed the affidavits, then the declaration of paternity may not be modified or set aside.[15] Hence, a genetic test would be futile under those circumstances, and a court could properly refuse to grant one. However, the Circuit Court never analyzed this issue at all; it examined §5-1028, not §5-1038.

## C.      *Whether a Genetic Test is Precluded by Res Judicata in this Case*

Finally, there is the basis on which the Majority opinion actually decides this case – *res judicata*, also called, perhaps more precisely, "claim preclusion."

*The Standard for Claim Preclusion*

Claim preclusion is "based upon the judicial policy that the losing litigant deserves no rematch after a defeat fairly suffered, in adversarial proceedings, on issues raised, or that should have been raised." *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 391, 761 A.2d 899 (2000). If, long after a case has completed, a party comes up with a better argument than it previously made in the case, that party does not get a do-over.

---

[15] At the 2011 hearing the Bureau attempted, somewhat unsuccessfully, to establish that Mr. Davis knew that he was not the father at the time he executed the affidavits, which would have rendered his request for a genetic test moot.

18

Likewise, claims that were required to be joined in the original case are waived unless they are asserted at that time; a party cannot begin a new case based on claims that should have been asserted before. *See Rowland v. Harrison*, 320 Md. 223, 577 A.2d 51 (1990) (discussing the relationship between mandatory counterclaims and claim preclusion).

The Majority opinion quotes a rough rule of thumb for the application of claim preclusion that includes all matters that "could have been litigated in the first suit." Majority slip op. at 3 (*quoting Prince George's County v. Brent*, 414 Md. 334, 342, 995 A.2d 672 (2010)).[16] However, the test for claim preclusion is not (and has never been) whether a matter "could have been litigated in the first suit." Otherwise, there would be no such concept as the permissive joinder of claims – a party would be compelled to join all possible claims and counterclaims (at the risk of waiving a claim that *could* have been

---

[16] The original version of this quotation was more qualified in describing this rule of thumb:

> The doctrine of res judicata is that a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit, *where the court had jurisdiction, proceedings were regular, and his omission was due to his own negligence.*

*Alvey v. Alvey*, 225 Md. 386, 390, 171 A.2d 92 (1961) (emphasis added). Even if this were a complete statement of the law, Mr. Davis would not be precluded on his paternity test on the ground that the paternity test "could have been litigated in the first suit" in 2011, because Mr. Davis did not omit any claims due to his own negligence (he asked for a paternity test), and arguably the proceedings here were not regular in any event, because the judge did not rule explicitly on a significant claim before the court. However, this is not a complete statement of the law. The actual legal standard differs significantly from this rough description, as outlined in the text.

joined in an earlier case). *See Kent Cty. Bd. of Educ. v. Bilbrough*, 309 Md. 487, 497, 525 A.2d 232 (1987) ("To make the scope of "claim" co-extensive with permissive joinder of claims in pleadings would have the same effect as a mandatory joinder for pleading purposes of all claims which the original plaintiff has against any original defendant."). Thus, this quoted phrase is not a definitive statement of claim preclusion.

Instead, claim preclusion applies when (1) the parties in the present litigation are the same or in privity with the parties to the earlier dispute, (2) the claim presented in the current action is identical to the one determined in the prior adjudication and (3) there was a final judgment on the merits on the claim in the prior litigation. *See Powell v. Breslin*, 430 Md. 52, 64, 59 A.3d 531 (2013).

*Claim Preclusion as to Rescission of the Affidavits of Parentage*

I agree with the Majority opinion that this standard would be met to the extent that the Circuit Court construed the 2011 litigation as a contest over rescission of the affidavits of parentage on the grounds of fraud, duress, or material mistake of fact. Certainly, the parties are the same: Mr. Davis and the Bureau were parties in 2011. The Circuit Court in 2011 found "that there is no fraud, duress, or mistake of material fact that would justify the rescission of the affidavits of Parentage properly executed." Hence, given the identical parties, identical claim, and final judgment on the merits in the previous action, Mr. Davis is precluded from advancing a fraud claim that would allow him to rescind the affidavits of parentage.

*Claim Preclusion as to the Request for a Genetic Test*

That does not end this case, however. The core reason that claim preclusion does not apply to Mr. Davis' request for a mandatory genetic test under §5-1038 is that there was no final judgment on the merits of that claim.[17] The Majority describes the Circuit Court's order in 2011 as "denying" Mr. Davis's request for a genetic test, Majority slip op. at 4, but the order did not say that. The court simply issued an order requiring child support based on a finding of paternity. The order said nothing one way or the other about the genetic test claim, and claim preclusion does not arise out of nothing.

---

[17] The Majority asserts that this is "an argument never raised below before [the Circuit Court] in 2013, nor before the Court of Special Appeals[.]" Majority slip op. at 4.

However, in the complaint initiating the 2013 case, Mr. Davis alleged, "The Court did not address the repeated requests made by Mr. Davis throughout the proceeding for a blood test to prove he was not the biological father (*see* Family Law Article Sections 5-1029 and 5-1038) and made no decision regarding his requests." Counsel for the Bureau understood this contention, because Bureau counsel began oral argument at the 2013 hearing by saying, "The other allegation in the Complaint is the Court didn't address the Defendant's request for blood test."

Before the Court of Special Appeals, Mr. Davis argued in his opening brief, "The Circuit Court [in 2013] erred by ... relying on Judge Mitchell's reasoning and analysis, when section 5-1038(a)(2)(i)2 was never considered and certainly never addressed by Judge Mitchell." Before us, too, Mr. Davis stated in his opening brief, "Judge Mitchell never considered Davis's multiple requests for a paternity test, and he never made any express ruling on the issue." He added in his reply brief, "Because that court refused to consider any fact or issue other than Davis having signed the affidavits of Parentage, there was no hearing on issues involved in the section 5-1038(a)(2)(i)2 claim."

It is evident from the record that Mr. Davis has argued from the beginning of the instant case that the 2011 trial never decided the §5-1038 claim.

21

Nor did the Circuit Court's oral ruling deny Mr. Davis' claim, as the Majority argues. The Majority opinion accurately points out that Mr. Davis asked for a genetic test several times during the 2011 proceeding and contends that the Circuit Court "specifically responded to Mr. Davis's repeated requests for a paternity test" in its oral ruling. Majority slip op. at 6-7. However, the block quotation that follows that assertion in the Majority opinion only discusses whether the affidavits of parentage could be rescinded under §5-1028. Indeed, as part of that passage, the Circuit Court explicitly says that it is addressing *only* the §5-1028 issue. In particular, the Circuit Court says, "The issue in this case is not the fatherhood of the child. The issue in this case is whether there is the presence of fraud, mistake, or duress that would justify the rescission of an Affidavit ...." That is how the Bureau framed the case at the opening of the proceeding. At no point in the 2011 proceeding did the Circuit Court say anything at all about Mr. Davis' request for a genetic test. It simply did not address that issue.[18]

This fact distinguishes *Hardy v. Hardy*, 380 S.W.3d 354 (Ark. 2011), which the Majority opinion cites as analogous to this case. In *Hardy*, a trial court in an earlier case

---

[18] To the extent that the Majority opinion believes that the trial court's silence concerning Mr. Davis' request for a genetic test means that the court implicitly decided that issue when it held that there was no showing of fraud that would justify rescission of the affidavits of parentage, such a belief cannot be based on the law governing genetic tests or affidavits of parentage. There is no requirement to show fraud to obtain a genetic test under §5-1029 and §5-1038, so the court's ruling on that issue did not decide the genetic test claim. And, as *Langston* illustrated, the fact that a paternity order is otherwise final does not disqualify one from later seeking a genetic test. Accordingly, the trial court's ruling concerning the affidavits of parentage did not necessarily decide anything as to the request for a genetic test. The supposition that the trial court intended to do so is sheer speculation.

22

had issued an order explicitly denying the father's motion for paternity testing because it was not in the child's best interest. *See Hardy*, 380 S.W.3d at 356. In those circumstances, claim preclusion properly followed from the final judgment on the merits in the earlier case. Here, however, neither the oral ruling nor the subsequent order said one word about a paternity test, so the claim is not precluded.

*The Effect of the Order under §5-1032*

At the conclusion of the 2011 proceeding, there was a final order declaring paternity under §5-1032. However, §5-1038, by its very terms, describes an exception to the rules of finality as to paternity judgments. *See* §5-1038(a)(1) ("*Except as provided in paragraph (2) of this subsection*, a declaration of paternity in an order is final.") (emphasis added). Because a judgment is preclusive insofar as it is final as to an issue, this exception to finality also necessarily implies an exception to preclusion: an order under §5-1032 does not preclude assertion of a right to a genetic test under §5-1038. If it did, then no one could *ever* set aside an order based on a genetic test, because the order itself would preclude the genetic test, but the statutory text and our precedents both clearly show that such an order may be set aside based on a genetic test. *See Langston, supra.*

A court may issue an order under §5-1032 that is final, subject to the exceptions in §5-1038. Such an order does not preclude a genetic test under §5-1038, so it need not resolve any such claim before the court at that time; the claim can be reasserted later to set aside the order. When the court issued such an order regarding Mr. Davis in 2011, it

23

left Mr. Davis' genetic test claim hanging: the claim had neither been granted nor denied.[19]

Thus, when Mr. Davis came to court again in 2013 and asked for a genetic test to set aside the declaration of paternity, claim preclusion did not bar his request for that test (although it did bar an attempt to rescind the affidavits of parentage). The court should have either granted Mr. Davis's request or given a reason under §5-1038 that Mr. Davis was not eligible for a paternity test. It was legal error to fail to do so, because, as noted above, §5-1038 references §5-1029, and the language in §5-1029 requiring a test is mandatory.

### Conclusion

After signing an affidavit of parentage acknowledging that he was the father of Ms. Cook's children, which, according to Mr. Davis, he believed was true at the time, Mr. Davis learned that he might have been misled and that someone else was the children's father. (Ms. Cook herself apparently agrees that the father is another man). Since that time, Mr. Davis has consistently maintained that he is not the father of Ms. Cook's children and has requested a genetic test.

The Circuit Court in 2011 did not address his request for a genetic test and instead ruled on a completely different issue, so its ruling was not a final judgment on the merits

---

[19] In this respect, the Majority opinion misconstrues the reason that I do not think that Mr. Davis is precluded here. It is not, as the Majority opinion suggests, that I think that "genetic testing was not a specific claim in issue" in 2011. Majority slip op. at 7. Mr. Davis certainly had asserted this claim. Rather, the Circuit Court never *resolved* this issue, because it never said anything about the claim. Hence, there was never a final judgment on the merits of this claim, and claim preclusion cannot apply.

of his genetic test claim. Hence, when Mr. Davis returned to court in 2013 and again requested a genetic test, he was not precluded from bringing this claim. As this Court has held in the past, genetic tests may be requested long after the judicial order that they are intended to challenge, and the statutory language provides that a court *must* grant a proper request for a genetic test, so there was no basis for denying Mr. Davis's request in 2013, at least at the summary judgment stage.

Unless the Circuit Court were to find that Mr. Davis is not credible when he says that, at the time he signed the Affidavit of parentage, he did not know that Ms. Cook's children were not his − a fact determination that is entrusted to the Circuit Court in the first instance − Mr. Davis should be granted a genetic test to determine, once and for all, whether he is the father of Ms. Cook's children.

Chief Judge Barbera and Judge Watts advise that they join this opinion.